# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF TEXAS

### BEAUMONT DIVISION

| | | |
|---|---|---|
| PYR ENERGY CORPORATION | § | |
| | § | |
| V. | § | 1:05-CV-530 |
| | § | |
| SAMSON RESOURCES COMPANY | § | |
| and SAMSON LONE STAR | § | |
| LIMITED PARTNERSHIP | § | |

## MEMORANDUM OPINION ON MOTIONS FOR SUMMARY JUDGMENT

This opinion states reasons and rationale for the court's decision on competing motions for summary judgment,[1] specifically, a "Motion for Summary Judgment of Samson Lone Star Limited Partnership and Samson Resources Company" and "Plaintiff's Motion for Partial Summary Judgment."  Docket Nos. 30 and 95, respectively.

## I. PARTIES; NATURE OF SUIT

Plaintiff, PYR Energy Corporation (PYR), is a publicly traded company organized and registered under laws of Maryland, with headquarters and principal place of business in Denver, Colorado.  Defendants are Samson Resources Company and Samson Lone Star Limited Partnership.  Samson Resources Company is an Oklahoma corporation and a wholly-owned subsidiary of Samson Investment Company, a general partner of defendant Samson Lone Star Limited Partnership.  Samson Lone Star Limited Partnership is a Texas limited

---

[1]     The action is before the undersigned United States magistrate judge for all proceedings and entry of judgment pursuant to an order reassigning the case (Docket No. 105) upon consent of the parties. See 28 U.S.C. § 636(c)(1).

partnership also owned by Samson Investment Company.  For present purposes, both defendants are referred to collectively as "Samson."

PYR and Samson each own mineral fee interests and oil and gas leases in an area called the "Nome Prospect" in Jefferson County, Texas.  A successful gas well was completed on a particular 122.57 acre tract within that area in June, 2004.  The well is operated by Samson as part of a 704 acre unit.

PYR asserts that Samson has underpaid royalty and working interest amounts due PYR under a written agreement entered in 2003 by Samson and PYR's predecessor.  PYR asserts that Samson pooled PYR's interests without authority and thereby breached the agreement by failing to pay overriding royalties and income attributable to its working interests based on PYR's full interest in the well production.[2]  Alternatively, and based on mutual mistake and scrivener's error, PYR seeks reformation of the contract to reflect that an "area of mutual interest" is as depicted on a plat allegedly circulated between the contracting parties on May 23, 2003, and represented on June 11, 2003, to be the intended plat.  Further in the alternative, PYR asserts a common law tort claim alleging that Samson breached its fiduciary duty by including non-productive acreage and properties in the above-referenced unit.

Samson denies these allegations and asserts, first, that it properly calculated and paid PYR's overriding royalties and working interests; the challenged 704 acre unit was duly

---

[2]       PYR asserts additionally that Samson breached the agreement by (a) failing to pay overriding royalties and working interests based on production from the well from and after project payout; (b) deducting from monthly joint interest billing statements an item labeled as "Legal"; and (c) failing to provide plaintiff information or access to information pertaining to the well and formation of the Unit.  Alternatively, if Samson has authority to pool, PYR asserts that Samson failed to perform various contractual obligations applicable in such circumstances. Pl.'s First Am. Compl. at 12-14.

authorized and formed pursuant to the contract; and all necessary consents were obtained. Alternatively, Samson asserts that PYR ratified the unit formed by Samson and thereby waived and is estopped from asserting a claim to payment for unpooled interests; PYR does not own the cause of action now asserted; the contract should be reformed – based on mutual mistake or fraud – to provide that Samson was authorized to pool or unitize all "Leases," as the term is used in the contract, including oil and gas leases and fee mineral interests reserved by PYR's predecessor; and Samson should recover from PYR overpayments of working interest revenues after project payout for lands located outside a contractually defined area of mutual interest.

## II. MOTIONS FOR SUMMARY JUDGMENT

Both parties seek contract reformation and assert various alternative claims. That circumstance alone makes it almost self evident that neither side is supremely confident in the strength of its legal position. Nevertheless, the parties – represented by able and experienced counsel – both seek tactical advantage by going on offense. That bilateral strategy manifests itself in competing motions for summary judgment arguing that undisputed facts so clearly favor the respective movants that the court may summarily dispose of the case without trial.

Samson got out of the gate first, moving for summary judgment on *all* claims asserted by PYR. PYR countered with a motion for *partial* summary judgment attacking Samson's allegedly unlawful pooling of PYR's interests, Samson's alleged failure to provide information pertaining to the development or operation of the properties, and Samson's alleged failure to make a "complete assignment" of a reversionary working interest upon project payout. PYR's motion initially appears to be a narrower, surgical strike. However, its potential effect is

virtually as broad as Samson's motion because if PYR's motion is granted, it will receive

complete relief thereby mooting alternative claims.

The core issue is whether Samson was authorized to pool PYR's interests in the tract

where the gas well is located.  That pivotal question must be examined in light of principles

governing determinations of motions for summary judgment.[3]  The court's analysis is aided by

a court-appointed subject-matter expert, Ernest E. Smith, Esq.,[4] who through written reports

and direct consultations ably and objectively advised the court on essential topics at issue in

this litigation.  Professor Smith's appointment followed a protocol conceived by "Court

Appointed Scientific Experts *(CASE)*," a project of the American Association for the Advance-

---

[3]     Standards governing motions for summary judgment are well-settled and
not disputed by the parties.  Summary judgment is appropriate when, viewing the
evidence in the light most favorable to the non-moving party, there is no genuine
issue of material fact and the moving party is entitled to judgment as a matter
of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); see also Fed. R.
Civ. P. 56(c).  An issue is genuine if the evidence is sufficient for a
reasonable jury to return a verdict for the non-moving party. Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 255-56 (1986).  The admissibility of evidence is
subject to the same standards and rules that govern the admissibility of evidence
at trial. Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 650 n.3
(5th Cir. 1992).
        Summary judgment is proper after adequate time for discovery and upon
motion, against a party who fails to make a showing sufficient to establish the
existence of an element essential to that party's case, and on which that party
will bear the burden of proof at trial. Celotex, 477 U.S. at 322.

[4]     Professor of Law and Rex G. Baker Centennial Chair in Natural
Resources Law at the University of Texas at Austin School of Law.  Professor
Smith is a specialist in oil and gas law.  He is co-author of the leading
casebook titled Cases and Materials On Oil and Gas Law (4th ed., West 2002) and
the leading treatise titled Texas Law of Oil and Gas (2nd ed., LEXIS Law Pub.
1998).  He also teaches in the area of property, and is co-author of a widely
used text, Cases and Materials on Property (8th ed., Foundation Press 2002).  He
also is a former Dean of the School of Law and has also been a Visiting Professor
at Harvard Law School.  Professor Smith was the unanimous choice of opposing
counsel in this case to serve as an independent advisor for the court.

ment of Science (Science magazine publisher).  The protocol is recommended by the Federal

Judicial Center.[5]

### III.  PROCEDURAL AND FACTUAL BACKGROUND

The central transaction in this case is a 2003 Purchase and Sale Agreement (PSA)

between Venus Exploration, Inc. (Venus) and Samson.  Venus sold to Samson its 50% interest

in mineral fee and leasehold interests in various tracts of land in the Nome Field in Jefferson

County, Texas.  It reserved two interests in the properties.  One was a royalty (referred to in

the agreement as an overriding royalty interest (ORRI)) reserved to the extent that existing

royalties burdening the properties did not exceed a specified size.  The other, termed a

"reversionary working interest," was to be assigned to Venus after project payout, i.e., the

point at which Samson recovered certain defined investment expenses from a specified amount

of gross proceeds.

Properties covered by the PSA included the 122.57 acre tract mentioned earlier.  The

parties now refer to it as "Tract 3" and also as "Sun Mineral Fee tract."  This tract, like other

mineral fees and leaseholds covered by the PSA, was owned originally by Sun Oil Company

(Sun).  In 1993 Sun entered into a farmout agreement and a Joint Operating Agreement (JOA)

with Anadarko.  The following year it executed a term mineral deed conveying a 60% interest

in the Sun Mineral Fee tract and other tracts to Anadarko.  In 1994 a gas well was drilled on

one of the mineral fee tracts subject to the Anadarko farmout, and a pooled unit (the Sun Fee

No. 1 Gas Unit) was formed.

---

[5]      The court-appointed expert project is reported at http://
case.aaas.org.  See also, ABA, Section of Sci. & Tech., Scientific Evidence
Review, Monograph No. 7 at 19 (Cynthia H. Cwik & Helene E. Witt eds., 2006).

In 1996 Sun conveyed all of its remaining interest in these properties, except for certain rights in the existing gas well, to Anadarko.  Over the ensuing years the properties, including the Sun Mineral Fee tract, were the subject of a complex series of assignments, partial assignments, and letter agreements, often accompanied by joint operating agreements.  Venus and others jointly purchased a 40% interest in the mineral fee and lease properties from Anadarko on September 30, 1996.  Further, Venus and another entity purchased Anadarko's remaining 60% interest in 2001.

In December, 2002, Venus entered into bankruptcy proceedings.[6]  While in bankruptcy Venus sought to sell certain assets, including its interests described in the PSA.  The bankruptcy court approved this sale to Samson by order dated August 21, 2003.  Subsequently, and again with bankruptcy court approval,  PYR purchased from Venus the interests Venus reserved in the PSA.

By this time, the old Sun well ceased commercial production.  More or less contemporaneously with PYR's purchase, Samson re-entered the well bore of the old well and drilled a directional well, known as the Sidetrack Well, bottomed on the 122.57 acre Sun Mineral Fee tract.[7]  It pooled the tract into a new, 704 acre pooled unit (the Sun Fee No. 1 Sidetrack Gas Unit).

---

[6]     Venus became a debtor in an involuntary bankruptcy in the Eastern District of Texas, Beaumont Division. *See In re Venus Exploration, Inc.*, No. 02-13109-BP-11 (Bankr. E.D.Tex. October 9, 2002).

[7]     Trail Mountain also owned a working interest in the properties and participated in the side-tracking operation.  It is not, however, a party to this litigation, so for convenience, Samson is treated throughout this opinion as the sole owner of all interests other than those owned by PYR.

On August 5, 2005, PYR filed suit against Samson, alleging that Samson breached the PSA by pooling its interests without authorization.  That allegation raises the principal issue in dispute, i.e., whether Samson had the legal right to pool PYR's interests.  If the pooled unit is binding on PYR's interest, Samson's payments to PYR will be proportionate to the size of the well-site tract relative to the size of the entire pooled unit.  If the pooling is not valid as to PYR's interests, PYR will be entitled to the full interest in production from the Sidetrack Well in accordance with the PSA provisions reserving what the agreement termed "ORRI" and "reversionary working interest."

## IV.  POOLING AND TEXAS CASE LAW

Pooling of two or more tracts into a single drilling or production unit often is highly desirable or even essential to develop underlying hydrocarbon resources.  4 Eugene Kuntz, A Treatise on the Law of Oil and Gas § 48.3(a)(1) (1998 & Cum. Supp. 2005).  Geology, engineering technology, avoidance of duplicative capital investment in drilling and related infrastructure, and government regulations such as those promulgated by the Railroad Commission that control well density or well production, often dictate pooling.  Id.; see generally 2 Ernest E. Smith & Jacqueline L. Weaver, Texas Law of Oil and Gas §§ 9.3 to 9.7 (2d ed. 1998 & 2006 Updates).  In such situations, pooling typically benefits both the lessee and royalty owners.  As a result, Texas courts recognize that pooling is a standard and widespread industry practice that should be encouraged as a broad policy matter.  See, e.g., Texaco, Inc. v. Lettermann, 343 S.W.2d 726 (Tex. Civ. App. – Amarillo 1961); Kuntz, supra, § 48.3(a)(1).

## A.      Requirement of Express Pooling Authority

Notwithstanding declared policy in favor of pooling, repeated judicial rulings hold that a lessee has no power to pool royalty interests without express consent of their owners.  These rulings apply to overriding royalties (ORRIs) and to nonparticipating royalty interests (NPRIs).[8]  E.g., Montgomery v. Rittersbacher, 424 S.W.2d 210 (Tex. 1968); Brown v. Smith, 174 S.W.2d 43, 46 (Tex. 1943); Brown v. Getty Reserve Oil, Inc., 626 S.W.2d 810 (Tex. App. – Amarillo 1981); see Union Pacific Resources Co. v. Hutchison, 990 S.W.2d 368, 370 (Tex. App. – Austin 1999).  Similarly, in absence of express authority in its lease, an oil and gas lessor has no power to pool its lessee's interest unless it complies with mandates of the Texas Mineral Interest Pooling Act and obtains a forced-pooling order from the Texas Railroad Commission.  See Carson v. Railroad Comm'n, 669 S.W.2d 315 (Tex. 1984).

The principal rationale for requiring express authority to pool an interest is based on Veal v. Thomason, 159 S.W.2d 472 (Tex. 1942), which held that pooling effects a cross-conveyance of interests.  As a result of pooling, owners of mineral and royalty interests no longer own full interests in their respective individual tracts; rather, after pooling they own undivided interests in the entire pooled unit in the proportion that each owner's contribution bears to the pooled unit.  Such a significant change in ownership rights, which reduces the percentage of ownership the mineral and royalty owners had in their original tracts, necessarily

---

[8]      Although all royalties generally have the same basic legal characteristics, they are given different names in accordance with the type of transaction in which they were created.  The most common royalty, reserved by a landowner when executing an oil and gas lease, is called a lessor's royalty or a landowner's royalty. See Smith & Weaver, supra, § 2.4(B)(3).  A royalty resulting from a reservation or grant in a deed between private landowners is commonly called a nonparticipating royalty (NPRI). See id. at § 2.4(B)(2).  A royalty reserved or assigned by a lessee is referred to as an overriding royalty (ORRI). See id. at § 2.4(b)(3).

requires express authorization of the owner.  <u>See</u> <u>Montgomery</u>, 424 S.W.2d at 213.  This

rationale applies equally to working interests as well as to royalty interests.  <u>Id.</u>

Most pooling controversies arise over the scope of pooling authority granted by the

pooling clause in an oil and gas lease.  In keeping with the requirement that pooling authority

must be expressly given, Texas courts give a strict and literal construction to lease pooling

clauses.  The leading case is <u>Jones v. Killingsworth</u>, 403 S.W.2d 325 (Tex. 1965), where the

pooling clause in the oil and gas lease imposed a 40-acre size limit upon pooled units, but

provided that if a governmental agency should "prescribe or permit the creation of units larger

than those specified, units thereafter created may conform substantially in size with those

prescribed by governmental regulations."  <u>Id.</u> at 327.  Special field rules promulgated by the

Railroad Commission required an operator to assign at least 80 acres to a well, but permitted

the operator to assign up to 160 acres to a well in order to receive a larger well production

allowable.  The lessee purported to pool the tract at issue into a 160-acre unit, and in the

resulting litigation the Texas Supreme Court ruled that the unit was invalid because it was not

authorized by the pooling clause.  The court held that the clause authorized the creation of

units larger than 40 acres only if such units were *prescribed* by the Railroad Commission; it

did not authorize the creation of units up to the size of those merely *permitted* by the Commis-

sion.  The underlying policy rationale of the Railroad Commission rules, which permitted an

operator to avoid unnecessary drilling by getting the full advantage of a well's drainage area,

was insufficient to override the precise wording of the pooling clause.  As <u>Killingsworth</u>

stated, "*Absent express authority, a lessee has no power to pool interests in the estate retained*

*by the lessor with those of other lessors*."  <u>Id.</u> at 328.

<u>Killingsworth</u> is not unique in emphasizing a precise reading of pooling authority clauses.  Texas courts of appeals repeatedly take this approach.  <u>See</u> <u>Union Gas Co. v. Gisler</u>, 129 S.W.3d 145 (Tex. App. – Corpus Christi 2003); <u>Browning Oil Co., Inc. v. Luecke</u>, 38 S.W.3d 625 (Tex. App. – Austin 2000).  Further, the Texas Supreme Court recently reaffirmed its position in <u>Tittizer v. Union Gas Corp.</u>  <u>See</u> 171 S.W.3d 857 (Tex. 2005).  The court held that a pooling clause authorizing a lessee to pool the tract at issue "by executing an instrument identifying such unit and filing it for record in the public office in which this lease is recorded," did not permit the lessee to make pooling effective as of the date of a well's first production; pooling could be effective only as of the date of formal recordation of the unit designation.  <u>Tittizer</u>, 171 S.W.3d at 860.  In so ruling, the court stated:

> *A lessee has no power to pool without the lessor's express authorization, usually contained in the lease's pooling clause.* <u>Southeastern Pipe Line Co. v. Tichacek</u>, *997 S.W.2d 166, 170 (Tex.1999);* <u>Jones v. Killingsworth</u>, *403 S.W.2d 325, 327-28 (Tex.1965) ("The lessors' land may be pooled only to the extent stipulated in the lease.").  For pooling to be valid, it must be done in accordance with the method and purposes specified in the lease.* <u>Tichacek</u>, *997 S.W.2d at 170.*

171 S.W.3d at 860.

## B.      Exceptions

A law of nature is that for every action there is an equal and opposite reaction.[9]  Less immutable law of man embraces a somewhat parallel principle, i.e., for almost every general rule – such as the one just articulated in the preceding section – there is an exception.  Thus, in appropriate circumstances a specific exception trumps a general rule.  Samson advocates applicability of specific exceptions in this controversy.

---

[9]      Sir Issac Newton developed his "Third Law of Motion" in the 17th century. William P. Crummett & Arthur B. Western, <u>University Physics: Models and Applications</u> 108 (WCB/McGraw Hill 1994).

1.      Interests Assigned or Reserved in Leases Containing Pooling Clauses

There is at least one judicially-recognized exception to the rule that pooling authority must be expressly granted. When an interest is reserved or conveyed out of an interest created by an owner who authorized a lessee or other operator to pool his interest, the newly created interest is also presumptively subject to pooling. *See* 2 Howard Williams & Charles Meyers, Oil and Gas Law § 339.3 (Bruce Kramer & Patrick Martin ed. 2005). In Union Pacific Resources Co. v. Hutchison, 990 S.W.2d 368, Morgan executed an oil and gas lease that contained a pooling clause and provided for the usual landowner's royalty. The lessee assigned the lease to Fuller, reserving a 3% overriding royalty. Fuller re-assigned the lease to the defendant who pooled part of the leased acreage with other land. In resulting litigation over whether the defendant could pool the lessee's retained interest, the court held that the plaintiff's overriding royalty was subject to pooling, even though she had not given her express consent. The court reasoned that "[t]he legal effect of [the plaintiff's] unqualified assignment was to vest in Fuller, his heirs, successors and assigns, the identical rights, privileges, and benefits [plaintiff] possessed under the Morgan Lease, which included an express power to pool." Id. at 371.

An analogous approach has been taken when parties enter into a farmout of leases that contain pooling clauses. The Texas Supreme Court stated that in such a situation, "in the absence of an express provision to the contrary in the subsequent assignments or farmout agreements, [the farmee] had the right to form gas units." Mengden v. Peninsula Production Co., 544 S.W.2d 643, 647 (Tex. 1976).

2.    Presumed Pooling Authority: Industry Custom and Surrounding Circumstances

Samson proposes a second exception that would empower courts to declare pooling authority exists when (a) the relevant transaction is between oil companies or persons active in the industry, and (b) surrounding circumstances reflect an underlying intent of the parties to allow pooling.  Samson relies principally upon City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515, 519 (Tex. 1968), as authorizing courts to construe a contract "in light of the surrounding circumstances," and upon Mengden for the importance of identity of the parties, custom in the oil and gas industry, and nature of the transactions.

In City of Pinehurst, the Texas Supreme Court, while stating that a court must determine intent "as expressed or as is apparent in the writing," looked to an exchange of letters between the parties' attorneys to determine the meaning of the term "then market value" used in the contract.  432 S.W.2d at 517-518.  In Mengden, which involved a dispute between parties to a farmout over when payout occurred on tracts within a pooled unit, the Texas Supreme Court quoted with approval the following statement from Texaco, Inc. v. Lettermann:

> That pooling or unitizing of oil and gas leases is a standard practice in the industry can not be questioned.  It is equally recognized that unitization is often a more feasible method of operation from an engineering and scientific point of view. Unitization can be said to be advantageous to both lessors and lessees. We think these facts lead to the conclusion that in the absence of clear language to the contrary, pooling clauses should not be construed in a narrow or limited sense.

343 S.W.2d at 732.

Samson concludes that when disputes between oil companies or persons active in the industry are involved, cases such as Mengden, Texaco, Inc. v. Letterman and Hutchison invariably support the farmee's or lessee's exercise of pooling authority.  Cases such as

Killingsworth and Gisler, which require a rigid adherence to the precise language of a pooling

clause, should be limited to disputes between a landowner and an oil company.

### V.  APPLICATION AND ANALYSIS OF UNAUTHORIZED POOLING CLAIM

The complexity of this case lies not in Texas case law concerning pooling and the right

to pool, but in applying these cases, mostly developed in relatively straight-forward situations,

to the long and complicated series of transactions culminating in the PSA and referenced in the

PSA and other instruments.  Proper analysis, therefore, is necessarily a tedious exercise

requiring examination of the PSA and other relevant documents.

### A.      Does PSA Expressly Grant Samson Pooling Authority?

PYR, as assignee of Venus, took its interests subject to the terms of the entire June 12,

2003, PSA which contains no provision explicitly authorizing Samson to pool interests retained

by Venus (now PYR) without Venus's consent.  When express authority to pool a royalty is

granted, such authority is usually set out in the instrument creating the royalty.  Samson,

however, points to three provisions of the June 12, 2003, Purchase and Sale Agreement (PSA)

and to the Joint Operating Agreement (JOA) attached to the PSA as providing the necessary

authorization.

### 1.      Paragraph 6 of the PSA

Samson advances two arguments based on language of paragraph 6, wherein Venus

reserved an ORRI in interests it conveyed to Samson.  The interests conveyed are collectively

referred to in "Exhibit B" of the PSA as "Leases," whether they are in fact leases or mineral

fees.  Subparagraph (ii) of paragraph 6 stipulates that Venus's royalty will be proportionately

reduced "*[i]f the Leases or any part thereof are pooled into any voluntary units for a producing*

*oil and gas well . . . .*" Venus–Samson PSA at 2.  This language identifies the Sun Mineral

Fee as a lease and clearly presupposes that pooling may take place.

      Under Texas case law, however, such language falls short of granting express pooling

authority to the grantee.  It provides that *if* the Leases or any part thereof are pooled the

reserved royalty will be proportionately reduced.  There is no language providing that Samson

has authority to pool the royalty without Venus's consent.

      A second argument is based on paragraph 6, subparagraph (iii), wherein the contracting

parties stipulated that "*the Venus ORRI shall be treated in the same manner as the Lessor's*

*royalty under any of the Leases to which said Venus ORRI attaches or is burdened by . . . .*"

Venus–Samson PSA at 2.  The term "Leases," in turn, refers to all interests listed in Exhibit

B, including oil and gas leases with standard pooling clauses.  Facially, this argument seems

stronger because lessors' royalties under the oil and gas leases in Exhibit B are subject to

pooling without the requirement of any additional consent on the part of the lessors.

      Samson's argument possesses logical continuity, but this delicate combination of

language and documents does not meet rigid requirements of *express* authority to pool.  Even if

it did, Samson's argument would not settle the issue because subparagraph (iii) explicitly states

that the reserved ORRI is to be treated in the same manner as the Lessor's royalty in *leases to*

*which the ORRI attaches or burdens*.  As noted earlier, the ORRI was reserved only to the

extent that existing royalties burdening the properties did not exceed a specified size.

Paragraph 6, subparagraph (i) entitled Venus to an overriding royalty in the oil and gas leases

*only to the extent that existing royalty burdens on the leases did not exceed a specified percentage*.  The parties agree that in every instance, the lessor's existing royalty on the leases *exceeded* specified percentages expressed in the PSA.  Therefore, Venus's ORRI did not attach to or burden any of the oil and gas leases covered by the PSA.  Because of the size of existing lease royalties, Venus was not entitled to an ORRI in any of the *leases* and so reserved its ORRI only in the *mineral fee* tracts.[10]  As a result, subparagraph iii on which Samson bases its argument had no effect on PYR's interests.

### 2.   Paragraph 12 of the PSA

A further argument for pooling authority advanced by Samson at oral argument is based on paragraph 12 of the PSA.  In this paragraph, Venus represents and warrants to Samson, that it has the right to enter into the agreement; that it has paid all royalties and ad valorem and other taxes owed on the properties; and that "there are no other contracts or agreements affecting the Venus Assets except as set forth on the attached Exhibit 'E.'" Venus–Samson PSA at 5, ¶ 12(vii).  Exhibit E contains a list of twelve letter agreements, lease assignments, and other instruments all containing pooling clauses or referring to pooling.

These various instruments are not, however, expressly incorporated into the body of the PSA, and the language of paragraph 12 does not warrant that these instruments are still in effect.  Rather, as in many real estate transactions, the paragraph warrants that these are the only instruments that *may* affect Samson's title or rights.  Conveyances of mineral interests commonly are made subject to subsisting oil and gas leases and other outstanding interests of

---

[10]    See Land Summary – Venus Exploration, Inc., Nome Prospect, Jefferson County, Texas at 30-42 (Docket 30-3).

record. Smith & Weaver, supra, vol. 1, § 3.8(A).  When a specific inoperative or terminated

oil and gas lease is referenced in the deed, the conveyance does not automatically have the

effect of validating or reviving the lease.  Id. at § 3.8(B).

    3.    2003 Joint Operating Agreement

    Samson's fourth argument for express pooling authority rests on language in the Joint

Operating Agreement (JOA) attached to the PSA.[11]  The JOA designates Samson as Operator,

and a typed addition to Article VI, provides that, "*The actual configuration of, and amount of*

*lands included in a Lease Unit shall be designated by Operator.*"  2003 JOA at 5.  This

language can be construed to grant the Operator authority to pool the various tracts and

interests subject to the JOA into a "Lease Unit."

    PYR counters that the language is equally consistent with a construction that grants the

Operator the sole right to designate the size and configuration of the initial unit without

consultation or consent of non-operators, but only within parameters of the basic authorizations

given by the various interests contributed to the JOA.  PYR also points to the specific context

in which the sentence appears.  It is the final sentence in a paragraph dealing with a foreseeable

situation where a JOA participant elects not to participate in the initial well contemplated by

the JOA and, PYR suggests, is therefore limited to that situation.  In any event, PYR argues,

---

[11]    This JOA is a slightly modified version of the American Association
of Petroleum Landmen's 1982 Model Form (hereinafter 1982 Model Form). See App.
to Defs.' Mot. for Summ. J. at Tab Nos. 1A & 1B.  Parties to joint operations
usually choose one of four model forms developed by the American Association of
Petroleum Landmen as the basis for their agreement. Smith & Weaver, supra, vol.
3, § 17.3(A).  The different versions are commonly designated by the date they
were adopted, i.e., 1956, 1977, 1982 and 1988. Id.  The parties may, of course,
make changes or modifications in the form selected, as the parties did here with
respect to Article VI of the 1982 Model Form and possibly other provisions not
pointed out to the Court.

the language does not meet the requirement of the Texas cases that pooling authority must be clearly and expressly given.  E.g., Killingsworth, 403 S.W.2d 325; Luecke, 38 S.W.3d 625.

Language in these decisions supports PYR's position, although neither these nor other Texas cases involved construction of language similar to that inserted in this JOA.  Irrespective of that distinction, however, there is an additional reason why the JOA language, regardless of its construction, does not authorize pooling the royalty.  A close reading of the PSA again raises doubt whether this provision applies to PYR's royalty.  The only reference to the JOA in the PSA is found in paragraph 9, which provides that "*upon Project Payout, all subsequent operations . . . shall be conducted in accordance with the terms of that form of joint operating agreement attached hereto as Exhibit 'D' . . . .*" Venus–Samson PSA at 4.  In other words, the JOA provisions were to become binding only when Venus (now PYR) received its working interest after project payout.  Prior to project payout, the initial well must necessarily have been in production for some time in order for the operator to recoup its capital expenditures.  During this pre-payout period Venus (now PYR) would necessarily have been receiving income from its royalty.  Therefore, the provision of the JOA quoted in the first paragraph of this section necessarily is inapplicable to PYR's royalty.

This interpretation is consistent with the purpose of the typical JOA as well as with the language used in paragraph 9 of the PSA.  The basic purpose of a JOA is to establish rights and duties of working interest owners who participate in drilling and operations.  Smith & Weaver, supra, vol. 3, § 17.3(A).  A JOA controls how, when, and what percentage of expenses are paid by the operator and non-operator working interest owners.  Id.  Venus (and now PYR) was to receive a working interest and become an active participant in the JOA only

upon project payout.  Unless the parties made significant changes to the <u>1982 Model Form</u> not pointed out to the Court or included in the various appendices to their briefs, PYR, prior to payout, was a royalty owner only and, as such, was a non-participant that had no duty to pay a proportionate share of capital or operating expenses.  PYR had no right to participate in the various options and decisions set out in the JOA.  Paragraph 9 of the PSA recognizes that the JOA would become relevant to the parties' relationship only after Venus (now PYR) received a working interest.

In sum, analysis of the literal language used in these documents compels the conclusion that none of the language of the PSA or its attachments expressly granted Samson authority to pool the ORRI.  This approach is consistent both with the language and approach taken by Texas courts when construing pooling clauses.  These cases look at the precise language used by the parties and construe and apply it literally as written.  <u>See</u>, <u>e.g.</u>, <u>Killingsworth</u>, 403 S.W.2d 325, and the other cases cited in Section IV., Subsection A., <u>supra</u>.

The conclusion just announced may well be contrary to general custom and usual expectations of industry participants when they enter into farmouts, JOAs, and analogous arrangements in which a party is authorized to drill one or more wells.  The conclusion that the PSA does not grant Samson pooling authority may also be contrary to the expectation of the original parties.[12]  Therefore, interests of justice require the court to consider next whether any exception described earlier in Section IV., Subsection B., or other counterindication warrants a different result.

---

[12]      As Samson argued, paragraph 6 unquestionably presupposes that pooling may take place; the instruments listed in Exhibit E to the PSA contain references to pooling, and the language of the JOA attached to the PSA can be construed to authorize pooling.

**B.      Exception re Interests Assigned or Reserved in Leases With Pooling Clauses**

Under cases such as <u>Union Pacific Resources Co. v. Hutchison</u> and <u>Mengden v.</u>
<u>Peninsula Production Co.</u>, PYR's royalty and reversionary working interest are subject to
pooling if they were carved out of an interest, such as a standard oil and gas lease, that
authorized Samson to create pooled units.  The royalty at issue here, although labeled an
overriding royalty in the PSA, is actually a nonparticipating royalty interest (NPRI), since it
was reserved in a mineral fee.  Logically, however, the doctrine applicable to an overriding
royalty should also apply to an NPRI if it was created at a time when the grantor's interest was
subject to a lease authorizing pooling.  <u>See</u> Lee Jones, Jr., <u>Non-Participating Royalty</u>, 26 Tex.
L. Rev. 569, 598 (1948); Smith & Weaver, <u>supra</u>, § 4.8 at 4-121.

Whether the Sun Mineral Fee tract was subject to such a lease at the time of the June
12, 2003, PSA, when Venus reserved its royalty, depends upon the interpretation of two
earlier JOAs and whether they had continuing application to the Sun Mineral Fee Interest.  The
underlying factual background is as follows:  On July 1, 2001, Anadarko assigned a 60%
interest in the Sun Mineral Fee to Venus and Trail Mountain, Inc.  This assignment was made
subject to an August 15, 1996, Letter Agreement between Anadarko and its prior assignees
(including Venus), which had attached thereto a JOA (the 1996 JOA), and subject also to the
original JOA between Anadarko and Sun (the 1993 JOA).  Both JOAs are versions of the <u>1982</u>
<u>Model Form</u> and contain in Article III a standard provision stipulating that if a participant
contributes an unleased mineral interest to the JOA, "*that interest shall be treated for all*
*purposes of this agreement and during the term hereof as if it were covered by the form of oil*
*and gas lease.*"  App. to Defs.' Mot. for Summ. J. at Tab No. 6A, p. 2; <u>id.</u> at Tab No. 8A, p.

2.  The lease forms attached to both JOAs provide that the lessee has pooling authority, subject to stipulated size limitations.  Id. at Tab No. 6B, p. 1 ; id. at Tab No. 8B, p. 1.

If Venus's unleased Sun Mineral Fee is treated as if covered by the attached form leases, Venus, which is "*deemed to own both the royalty interest . . . and the interest of the lease . . . ,*"[13] is in a position analogous to that of the original lessee in Hutchison who made an "unqualified assignment" of her lease, and reserved an overriding royalty in the assigned interest.  Her assignment had the legal effect of vesting in the assignee the power to pool the retained overriding royalty.  If the Sun Mineral Fee tract is deemed subject to a standard oil and gas lease, the same reasoning would apply to the royalty retained by Venus when it assigned its interest in the Sun Mineral Fee to Samson.

Samson's "deemed lease" argument ignores the purpose of the JOA provision that deems an unleased interest to be subject to a standard oil and gas lease.  This provision is found in Article III, which is concerned primarily with liability for cost of operations and payment of royalties, overriding royalties, and similar lease burdens.  The principal purpose of the subsection that deems an unleased interest to be subject to a lease is to bring such an interest within the ambit of the accounting provisions set out in the article.[14]  If the attached lease is a standard form, an unleased mineral interest is treated as a working interest, subject to

---

[13]    App. to Defs.' Mot. for Summ. J. at Tab No. 6A, p. 2; id. at Tab No. 8A, p. 2 (quoting language from  both JOAs).

[14]    Article III is devoted principally to sections dealing with how costs are allocated; how royalties are calculated and borne; and who has the obligation to pay excess royalties, overriding royalties and other such payments.

expenses, to the extent of 7/8ths and an expense-free royalty to the extent of 1/8th.  See, e.g., Am. Ass'n. of Petroleum Landmen Form 675 Oil and Gas Lease – Texas Form, ¶ 3.

On the other hand, while limiting the effect of the "deemed lease" to this purpose would be consistent with its basic purpose, such a limitation would arguably run counter to the language in Article III., Subsection A., that provides the interest is deemed to be subject to a lease "for *all* purposes of this agreement and during the term hereof . . . ."  Since one purpose of the JOA is to facilitate the formation and configuration of lease units, an unleased interest contributed to a JOA should be deemed leased for this purpose as well as for purposes of accounting.  See Smith & Weaver, supra, vol. 3, §§ 17.3(A)–(B) (discussing the purpose of the JOA and scope of the operator's authority).

There is, however, a more fundamental reason why the "deemed leased" provision does not apply to PYR's royalty.  Both JOAs provide that an unleased tract is deemed subject to the attached lease "during the term" of the JOA.  Neither the term nor the geographic scope of either JOA applies to the Sidetrack Well.  The 1993 JOA terminated in 2004 when the old Sun Fee No. 1 Gas Unit was dissolved and the well was plugged.  The 1996 JOA, like the 1993 JOA, designates Anadarko, which no longer owns an interest in the tract, as operator. While it is possible to have two or more valid JOAs with different provisions within a single tract, they must apply to separate strata or wells within that tract.[15]  As PYR argues, JOAs

---

[15]     The structure of the 1982 Model Form JOA makes it functionally impractical for more than one operating agreement to control the rights of the parties within a specific geologic or geographic area.  For example, Article V appoints one participant as operator with "full control of all operations on the Contract Area" and subsequent articles allocate expenditures, liabilities, and rights to production in accordance with each participant's fractional interest in the area governed by the agreement.

clearly contemplate that there can be only one operator for the well or geologic area covered thereby.  See Pitco Production Co. v. Chaparral Energy, Inc., 63 P.3d 541 (Okla. 2003) (pointing out that the term "operator" is always used in the singular in the JOA and holding that the instrument unambiguously provides for a single operator).

The parties' interest in the Sidetrack Well is controlled by the 2003 JOA attached to the June 12, 2003, PSA.  Unlike earlier JOAs, the 2003 JOA does not contain an attached form lease.  Article II of the 2003 JOA contains a list of attached exhibits, and the parties struck through "Exhibit 'B', Form of Lease."  See App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. at Tab H., p. 2.

In summary, some inferential support for a conclusion contrary to the one reached above in Section V., Subsection A., supra, arguably can be derived from Hutchison and Mengden.  However, these cases fall short of providing full and unqualified support for Samson's argument.  Therefore, the court concludes that the judicially-recognized exception to Texas's express pooling authority requirement is not applicable.

## C.    Proposed Exception for Presumed Pooling Authority Based On Identity of Parties and Surrounding Circumstances

All participants in all transactions, commencing with Sun's 1994 conveyances to Anadarko, are oil companies.  Virtually all transactions that preceded PYR's acquisition of the royalty, including the PSA, and PYR's acquisition of the royalty itself presupposed the possibility or even likelihood of pooling.  Indeed, the majority of the interests assigned under the PSA were leases containing pooling clauses.  Several of the leases covered very small

tracts and, without pooling, each tract would require its own well in order to maintain the lease in effect.  Samson argues that these factors should be taken into account in construing the intent of the parties with respect to the Sun Mineral Fee tract, which was only one of the tracts covered by the PSA.  If the various factors cited by Samson can be considered, then PYR's motion for summary judgment could be denied.

Samson further argues that the nature of some of the interests created and the nomenclature used in these transactions differ from those commonly used in mineral conveyances by and between private persons, and are more consistent with the types of interests created and the terminology used in transactions involving oil companies.  See Defs.' Resp. to Pl.'s Mot. for Partial Summ. J. at 19-20.  An example of the former is the terminable interest Sun created in 1994 when it conveyed a 60% interest in the Sun Mineral Fee tract to Anadarko.  See Defs.' Mot. for Summ. J. at Tab No. 7.  Anadarko's mineral fee interest would last for two years and as long thereafter as a letter agreement and attached JOA were in effect or oil or gas were produced or capable of being produced from the land or lands pooled therewith.  The deed also contained a pooling clause.  The clause did not authorize Anadarko to pool Sun's retained 40% interest, but was presumably included to set the parameters of the size of pooled unit in which Sun, as Farmor, was willing to participate.  Technically, Anadarko received a term mineral fee, an interest that is quite unusual in transactions between private landowners; and the special provisions relating to the letter agreement, JOA, and pooling sharply distinguish it from the type of interest that would be created by a private landowner.  See generally Owen L. Anderson, John S. Dzienkowski, John S. Lowe, Robert J. Peroni, David E. Pierce & Ernest

E. Smith, <u>Hemingway Oil and Gas Law and Taxation</u> §§ 2.1 to 2.5 (4th ed. 2004) [hereinafter <u>Hemingway</u>] (discussing the attributes of the typical mineral estate held by a landowner).

All interests at issue in this litigation are derived from this unusual interest.  Arguably, the terminology used in the PSA, which refers to Venus's reserved interest as an overriding royalty, rather than a nonparticipating royalty, is recognition that the Sun Mineral Fee has some characteristics of an oil and gas lease.

Samson buttresses its position that surrounding circumstances support its authority to pool by pointing to the testimony, among others, of Mr. Eugene L. Ames, Jr., President of Venus Exploration, Inc., given at a bankruptcy hearing addressing Venus's request that the court approve the sale of certain oil and gas properties owned by Venus, including the Sun Mineral Fee tract, to Samson.  During the hearing Mr. Ames was asked, "*In addition to the cash consideration, what else does Venus get out of this sale?*" App. to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J. at Tab. No. 12, p. 9.  Mr. Ames responded:

> *We are reserving an overriding royalty of seven percent in one lease. It's actually a mineral fee property that's held by production.  The unitization of that with the other leases, this is undivided interest lease then when you unitize it, the other leases that we don't have the overriding, we estimate it will give us an average overriding royalty of one percent, or possibly even one and a half percent, depending on the configuration of the units.*

<u>Id.</u>  Samson asserts that Mr. Ames's testimonial references to "unitization," "unitize," and "configuration of units" provide direct support for the proposition that the surrounding circumstances show intent to authorize Samson to pool the reserved interests now owned by PYR.

Adopting this line of analysis could support *denial* of PYR's motion for summary judgment, but it would not lead the court to *grant* Samson's motion for summary judgment. In the absence of express pooling authority given by either Venus or PYR, the intent of the parties would be a question of fact to be developed at trial, and it would involve evidentiary issues, including whether the testimony of Mr. Ames and others is admissible, and which of the surrounding circumstances are most relevant to an interpretation of the parties' intent in entering into the PSA.

Of more immediate interest, however, is whether the court should recognize Samson's proposed exception. The crucial issue is whether the line of analysis outlined above is fully supported by Texas case law. An expansive reading of cases principally relied on by Samson provides a reasonable basis for the purported exception, but falls short of providing full and unqualified support. The court in City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515, did, indeed, look to letters offering somewhat different versions of a paragraph to be included in a contract, but it did so in the context of construing an *express* contractual provision. It did not look to the letters or surrounding circumstances in order to *imply* a provision in the contract. Samson asks the court to look to surrounding circumstances and other factors, including the identity of the parties, in order to imply authority to pool from provisions that merely contemplate that pooling *may* take place. To follow the path advocated by Samson requires the court to ignore firmly entrenched doctrine that an unambiguous contract is enforced as written. See, e.g., Tittizer v. Union Gas Corp., 171 S.W.3d 857. Neither party here argues that the PSA is ambiguous.

Mengden, which Samson relies on heavily, involved a controversy over how expenses were to be allocated among tracts within a pooled unit.  All leases contained pooling clauses, and the farmee's authority to pool was not in question.  As the court made clear: "*Gas units #1 and #3 were formed by Mengden in accordance with the pooling terms of the 'A' and 'B' leases, with the wells located on the lease 'A' portions of each unit.  Peninsula does not deny the validity of the units.*"  Mengden, 544 S.W.2d at 647.  Samson correctly points out that the court states, "*in the absence of an express provision to the contrary in the subsequent assign-ments or farmout agreements, [the farmee] had the right to form gas units.*"  Id.  However, the court makes this statement in the context of an assignment of oil and gas leases that all contain pooling clauses – a situation analogous to that in Hutchison.  The court's reference to industry custom was made in connection with its conclusion that production and expenses were to be allocated proportionately among tracts within the pooled unit. The court reasoned that pooling is so customary within the industry that in the absence of a provision in the farmout agreement or lease assignment to the contrary, the parties should be advertent to the normal rights and effects of pooling provision of the leases, under which the total unit production and costs should be allocated to each lease in proportion to the number of acres contributed therefrom to the respective units.  544 S.W.2d at 647.

Finally, while cases involving farmouts and other transactions among oil companies generally uphold the exercise of pooling, and those involving lessor-lessee disputes do indeed require a pooled unit to comply with the precise requirements of the pooling clause, the former have involved leases containing pooling clauses; and nothing in the language used in the latter line of cases suggests that this rather rigid approach to pooling is limited to lessor-lessee

disputes.  To the contrary, express authority is required to pool an NPRI, which is created in transactions by ordinary landowners.  Brown v. Smith, 174 S.W.2d 43, 46 (Tex. 1943). Moreover, cases requiring strict adherence to pooling-clause language do not invariably favor the lessor.  In Tittizer, the Texas Supreme Court rejected the argument by a lessor that her tract was pooled with an adjacent tract from the date that a prolific gas first began producing on the adjacent tract.  171 S.W.3d 857.  Although the lessee filed a pooling designation stating that the tracts were pooled from date of first production, the court held that the lease pooling clause was controlling, and it authorized the lessee to pool the tract "by executing an instru-ment identifying such unit and filing it for record."  Id. at 860.  Hence, the lessor's right to share in royalties from the well dated from the date of filing the pooling designation, rather than from the date of initial production several months earlier.

Samson almost certainly is correct in stating that oil companies entering into agree-ments such as those involving the Sun Mineral Fee tract assume that pooling can and will take place.  The issue, however, is the meaning of the language that Venus and Samson used in the PSA, and not what they may have assumed or intended, but failed to include in their agree-ment.  In brief, although Samson's argument in favor of construing the PSA in light of the surrounding circumstances has substantial appeal, neither Texas case law nor the wording of the PSA fully supports this approach.

## D.    The Reversionary Working Interest

In preceding sections, the court concluded that Samson lacked express authority to pool PYR's interests, and that no exception to the Texas express authority rule applies.  PYR,

therefore, is entitled to summary judgment on its claim that Samson breached the PSA by pooling PYR's overriding royalty interest without PYR's consent.  Samson's lack of express authority to pool PYR's *royalty* does not, however, automatically compel a parallel conclusion that Samson wrongfully pooled the *working interest* to which Venus (now PYR) was entitled upon project payout.  A significant distinction exists if the working interest was already pooled into the Sun Fee No. 1 Sidetrack Gas Unit when PYR's right to it accrued.  The court, therefore, must examine the nature of the working interest created by the PSA.

Samson argues that Venus retained merely a contractual right to receive a working interest upon project payout.  Until that point, the entire interest in the Sun Mineral Fee tract, other than the ORRI, was owned by Samson, and PYR specifically concedes that Samson had the right to pool its own interests.  Under this construction, the situation is analogous to Hutchison: The right to the assignment accrued *after* Samson exercised its undisputed right to pool its own interest.  PYR's working interest was carved from the pooled interest, and PYR received its working interest subject to the prior pooling of the land of which it was once a part.

PYR, on the other hand, argues that the reversionary working interest was a presently vested future interest in the nature of a right of entry or possibility of reverter.  Bagby v. Bredthauer, 627 S.W.2d 190, 196-97 (Tex. App. – Austin 1981), stated, "Once a reversion, possibility of reverter or right of entry is created, that interest is 'vested' in interest at the time of its creation."  Id. at 196-97.  Hence, if PYR's reversionary working interest were a possibility of reverter or right of entry, it vested at the time of creation, and, like the ORRI, was not subject to pooling without its owner's express consent.

Under that construction, PYR would be entitled to summary judgment for unauthorized pooling of its working interest. It is black-letter law that absent a special statutory provision or agreement to the contrary, the owner of a present possessory interest cannot enter into an agreement that binds a future interest. For example, a life tenant cannot enter into an oil and gas lease that binds the remainderman. See Smith & Weaver, supra, vol. 1, § 2.3(B)(1). Similarly, the owner of a fee subject to a possibility of reverter or right of entry cannot bind the future interest. See Hemingway, supra, § 5.3 at 190. Therefore, if the PSA created an interest in Venus in the nature of a possibility of reverter or a right of entry, Samson's actions in creating a pooled unit were ineffective to bind the working interest for the same reasons its actions were ineffective to bind the ORRI.

The parties provide little guidance for deciding what language creates a vested property right in the nature of a right of entry or possibility of reverter as distinguished from language creating a covenant or contractual right to an assignment upon occurrence of a future event. As a general matter, the standard doctrine of contract interpretation applies: Classification of the interest depends upon the parties' intent as determined by the language used in creating the interest and by a consideration of the agreement as a whole. Concord Oil Co. v. Pennzoil Exploration and Production Co., 966 S.W.2d 451, 454 (Tex. 1998); Luckel v. White, 819 S.W.2d 459, 461-62 (Tex. 1991); Hudson v. Wakefield, 645 S.W.2d 427, 430 (Tex. 1983). Technical language is not necessary to create a reservation or exception, Security Development Co. v. Hidalgo County Drainage District No. 1, 124 S.W.2d 178, 181 (Tex. Civ. App. – Amarillo 1938); but in the event of uncertainty, general guidance is given by Rogers v. Ricane, 772 S.W.2d 76 (Tex.1989), which provides that doubts over the nature of an interest

should be resolved in favor of a covenant rather than a condition that automatically divests a party of a real property interest.  This constructional preference for a covenant rather than a condition is generally recognized and well-established:

> One important factor in consideration of this question which is often controlling is that *if there is any doubt, the court will favor the construction of a covenant rather than a condition, because conditions are looked upon with disfavor by the courts and all doubtful cases are decided in favor of a covenant construction.*

14 Am. Jur. Covenants § 3 at 481-82 (1938) (emphasis added).

Paragraph 7 of the PSA provides that "Venus shall also be entitled to a reversionary working interest" at Project Payout.  Venus-Samson PSA at 3.  Subparagraph (i) defines the size of the reversionary working interest; subparagraph (ii) defines "Project Payout"; and subparagraph (iii) provides that "Upon Project Payout, Samson shall assign said reversionary working interest to Venus."  Id.  Although the term "reversionary" implies a presently vested future interest, both the structure of the paragraph and the provision for assignment in the last subparagraph point more strongly toward a covenant or contractual right.  This construction is supported by contrasting paragraph 7, which entitles Venus to a reversionary working interest at Project Payout, with paragraph 6, which provides that "Venus shall reserve, and shall retain unto itself, an overriding royalty . . . ."  Id. at 2.  Language in paragraph 6 clearly refers to a presently owned interest, whereas language in paragraph 7 suggests that the interest will be acquired at a future date.

The deed assigning Venus's interests to Samson provides that the assignor reserves an overriding royalty and further reserves a reversionary working interest that the assignee shall assign to Venus upon Project Payout.  This deed is attached to the PSA as Exhibit "G-1" and

expressly made a part of the PSA.  As such, it must be construed along with all other provi-

sions of the agreement.  The language in the "Assignment of Term Mineral Deed" providing

that "Upon Project Payout, Assignee shall assign said reversionary working interest" to Venus

also implies a future acquisition.

This issue is close; but the constructional preference for a covenant rather than a self-

executing condition provides additional support for the conclusion that Venus's right to a

working interest was contractual.  Under this line of analysis, it follows that when Samson

formed the Sidetrack Unit, it owned all interests in the Sun Mineral Fee other than the reserved

ORRI.  As stated earlier, Samson was entitled to pool its own interests, and under Hutchison,

PYR received its working interest subject to prior pooling of land of which it was once a

part.[16]

### E.     Summary of Conclusions

Samson's authority to pool PYR's interests depends primarily upon language of the

PSA and other instruments referenced therein.  Although these instruments make repeated

references to pooling and the effect of pooling, they do not expressly authorize Samson to pool

the interests originally reserved by Venus and now owned by PYR.  Under Texas case law,

Samson's purported pooling of PYR's overriding royalty interest into the 704 acre sidetrack

unit was ineffective.

---

[16]     When Samson filed the unit for record on April 29, 2004, PYR had no
assured right to an assignment of a working interest.  According to PYR, Project
Payout did not occur until on or about October 15, 2004.  Although payout might
have been foreseeable when the unit was formed, nothing in the record suggests
it was a certainty.

The same conclusion does not apply to PYR's reversionary working interest.  Whether this interest was a presently vested future interest in the nature of a right of entry or possibility of reverter and not subject to pooling without its owner's consent, or whether it was merely a contractual right that did not accrue until project payout, depends upon the language used by the parties.  The language in the PSA providing that this interest is to be assigned on project payout is more consistent with a covenant or contractual right than a presently vested future interest.  Since, as PYR concedes, Samson had the right to pool its own interests, and since the reversionary working interest was carved from Samson's interest *after* the 704 acre unit had been formed, the reversionary working interest was already part of a pooled unit when PYR became entitled to receive it.

## VI.  OTHER ARGUMENTS RELEVANT TO POOLING

Sparring of excellent lawyers inevitably spreads a mare's nest of side issues across the table.  This case is no exception.  The Secondary arguments presented in this case are listed and discussed briefly in this section.

## A.    PYR's Standing

Samson pooled the Sun Mineral Fee tracts and other oil and gas leases by signing a Unit Designation on April 14, 2004.  Samson argues that since the unit designation occurred *prior* to the assignment of Venus's interests to PYR on May 7, 2004, Venus only has standing to assert a cause of action for improper pooling (i.e., lack of authority or pooling non-productive acreage) against Samson.  In support, Samson cites Denman v. SND Operating,

L.L.C., 2005 WL 2316177 (Tex. App. – Texarkana Sept. 23, 2005), for the proposition that a cause of action is personal property in Texas, and "is not assigned when real property is conveyed unless the conveyance expressly includes it." Defs.' Resp. to Pl.'s Mot. for Partial Summ. J. at 25.  Samson contends that none of the assignments or agreements between Venus and PYR refer to any cause of action regarding unauthorized pooling, and therefore, the cause of action still belongs to Venus.  Samson further relies on Robinson v. Weaver, 550 S.W.2d 18, 19 (Tex. 1977), wherein the court stated that "a cause of action generally can be said to accrue at the time when facts come into existence which authorize a claimant to seek a judicial remedy." Id. at 20.  Therefore, Samson contends that PYR is not entitled to pursue its claim even if Samson lacked authority to pool.

PYR responds that its right to share in the production from the Sidetrack Well arose only upon first production which did not occur until June 24, 2004.  Therefore, PYR's claim for relief based on unauthorized pooling arose from Samson's actions after PYR acquired its interests.  PYR argues that Denman supports its position because it states explicitly: "[T]he cause of action for injuries to property belongs to the owner of the property *at the time of the alleged injuries*." 2005 WL 2316177 at *3 (emphasis added).

Denman involved an action for negligent injury to realty and other tort claims including trespass, nuisance, and unjust enrichment.  At trial, defendants moved for dismissal because the injuries occurred before the Denmans purchased the land.  Id. at *1.  The trial court granted dismissal, and the issue of standing was appealed.  The court of appeals stated that in Texas, a plaintiff must have a cause of action for injury to property in order to have standing. Id. at *3.  Further, the court held that the cause of action for injuries to property belongs to the

person owning the property at the time of injury.  Id. (citing Lay v. Aetna Ins. Co., 599

S.W.2d 684, 686 (Tex. Civ. App. – Austin 1980)).  The court held that without express

agreement, a cause of action does not pass to a subsequent purchaser of the property, so he or

she cannot recover for an injury committed *before* his or her purchase.  Id.

Denman and other cases cited by Samson are *tort* actions.  Samson cites no similar rule

of Texas law applicable to assignees of *contractual* rights.  Indeed, Oxy USA, Inc. v. Cook,

127 S.W.3d 16 (Tex. App. – Tyler 2003), and Exxon Corp. v. Tyra, 127 S.W. 3d 12 (Tex.

App. – Tyler 2003), distinguish between causes of action in tort and those based on breach of

contract, stating that a subsequent owner who purchased land subject to an existing oil and gas

lease may have standing to pursue an action for breach of contract for failure to remove oil

field debris even though he lacks standing to assert a tort claim for injuries to land that

occurred before his ownership. Oxy USA, Inc., 127 S.W.3d at 20; Exxon Corp., 127 S.W.3d

at 15-16.  The court therefore doubts that Denman analysis applies here.

Assuming *arguendo* that it does, Denman does not dictate the result advocated by

Samson.  PYR owned its interests in June, 2004, when its right to share in the production

arose upon the Sidetrack Well's first production.  PYR was not injured until then, when its

interests in production were diluted because of Samson's pooling.  Thus, PYR was the owner

of its interest when injury first occurred, and PYR has standing even under a Denman

analysis.[17]

---

[17]   Robinson v. Weaver does not compel a different conclusion.  It
involved accrual of a cause of action in a medical malpractice case for purposes
of applying the statute of limitations.  It did not focus whatsoever on standing.

B.      **Ratification, Waiver, and Estoppel**

The assignment of Venus's ORRI and right to working interest to PYR occurred on

May 7, 2004.  The assignment instrument states:

> *This Assignment is made by Assignor and accepted by Assignee*
> *subject to . . . the terms, covenants and conditions of the instru-*
> *ments, contracts and agreements affecting the Properties or*
> *production therefrom recorded in Jefferson County, Texas, and the*
> *same shall bind Assignee and Assignee's successors and assigns on*
> *and after the Effective Time hereof.*

App. to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J. at Tab No. 16, p. 2.

A few days earlier, April 16, 2004, Samson filed with the Jefferson County Clerk the

704 acre Sun Fee No. 1 Sidetrack Gas Unit designation.  That designation was not recorded

until April 29, 2004, only *one week* before the Venus-to-PYR assignment containing the

language quoted above.  But since the Unit Designation was recorded before PYR was

assigned its interest, Samson argues PYR had constructive notice of its existence, and PYR's

agreement with Venus ratified the Unit Designation.  Thus, PYR waived and is estopped from

asserting the claims it now makes.

To further support its argument, Samson points out that PYR separately conveyed to

Venus a "net profits interest" in the properties it agreed to buy.  This conveyance was

approved by Venus's bankruptcy trustee on September 22, 2004.  A provision in the convey-

ance represented to the trustee that "*Certain of the Subject Interests may have been pooled or*

*unitized for the production of oil, gas and/or minerals prior to the Effective Date, or after the*

*Effective Date, may be so pooled or unitized in the future*."  Id. at Tab No. 17, p. 3.  Samson

asserts that this fact, together with the assignment language mentioned above, demonstrates express ratification of the Unit Designation.

In response, PYR argues it did not ratify the Unit Designation as a matter of law, and it contends no fact issues exist as to ratification, waiver, and estoppel.  PYR claims that it first discovered the Unit Designation on August 3, 2004; that PYR has never agreed with the amount of interest credited by Samson; and that it has always reserved its rights when receiving benefits under the Unit Designation.  PYR asserts that Samson has produced no competent summary judgment evidence to contradict PYR's record evidence,[18] and has also failed to show any record evidence of waiver or estoppel.

The court cannot resolve these arguments now.  Ratification, waiver, and estoppel are all affirmative defenses on which Samson carries the burden of proof.  Samson has not moved for summary judgment on these defenses, but rather advanced its arguments in contravention of PYR's motion.  Similarly, PYR has not moved for summary judgment against Samson's affirmative defenses.  In short, these issues are not in proper procedural posture for summary disposition.

Had either party moved for summary judgment, the court could not grant the motion. Samson's affirmative defenses all are entwined with its ratification argument.  The elements of ratification are: "(1) approval by act, word, or conduct; (2) with full knowledge of the facts of the earlier act; and (3) with the intention of giving validity to the earlier act." Providian Nat'l Bank v. Ebarb, 180 S.W.3d 898, 901 (Tex. App. – Beaumont 2005); Gibson v. Bostick

---

[18]       See Aff. of Kenneth Berry, Jr. at Tab No. 4, ¶ 11 (Docket No. 95-6).

<u>Roofing and Sheet Metal</u>, 148 S.W.3d 482, 492 (Tex. App. – El Paso 2004).  Ratification may

occur when a transaction benefits a party and that party has gained full knowledge of the

transaction.  <u>Miller v. Kennedy & Minshaw, P.C.</u>, 142 S.W.3d 325 (Tex. App. – Fort Worth

2003).  Ratification also requires assessing, in large part, the intent of the party.  <u>Ebarb</u>, 180

S.W.3d at 901.  When considering intent, ratification may be inferred from a party's course of

conduct and can be shown without express agreement.  <u>See</u> <u>Miller</u>, 142 S.W.3d at 342-43.

Samson's argument relies primarily on PYR's execution of the assignment quoted at the

start of this section when it was on constructive notice of the existing unit designation.  Samson

asserts PYR's constructive notice creates "an irrefutable presumption of actual notice."  Defs.'

Sur-Reply to Pl.'s Mot. for Partial Summ. J. at 9 (citing <u>HECI Exploration Co. v. Neel</u>, 982

S.W.2d 881, 887 (Tex. 1998)).  However, Samson's reliance on <u>HECI Exploration Co.</u> is

misplaced and questionable at best.  In <u>HECI Exploration Co.</u>, the Texas Supreme Court limits

constructive notice from deed records with actual notice primarily to situations where it is

necessary to protect and maintain the stability of land titles.  Where this limited situation or

some similar rationale is lacking, "public records have *not* been held to create an irrebuttable

presumption of notice."  982 S.W.2d at 887 (emphasis added).  Such a limited situation with

land titles does not exist between Samson and PYR.

Further, ratification requires more than a presumption: it requires "full knowledge" and

"intention of giving validity to an earlier act."  No record evidence shows that PYR fully

understood and intended to validate the unit designation when it executed the assignment.  No

record evidence disputes PYR's claim that it has always objected to the Unit Designation.  No

record evidence shows that PYR openly received benefits without complaint.  Hence, Samson

cannot summarily establish its affirmative defense of ratification, and the concomitant defenses

of waiver and estoppel.

Conversely, PYR cannot show that no genuine issues of material fact exist and that

PYR is entitled to judgment as a matter of law.  The assignment constitutes some evidence

supporting Samson's defenses, as does the subsequent conveyance by PYR to Venus of a net

profits interest.  Other relevant circumstances may exist, and must be determined by the fact

finder.

### VII.  ALLEGED BREACH BY FAILING TO CONVEY COMPLETE WORKING INTEREST

PYR's motion for partial summary judgment on its claim that Samson failed to make a

complete assignment of a working interest does not relate to pooling, and, therefore, is

unaffected by prior analysis in this opinion.  Regarding this prong of PYR's motion, PYR

acknowledges that – as contemplated by Paragraph 7 of the PSA – Samson assigned PYR (as

successor to Venus) a working interest upon project payout.  However, PYR asserts that

Samson failed to assign all of the working interest that the PSA required Samson to convey.

Paragraph 7, subparagraph (i), of that agreement states:

> At "Project Payout" (as hereafter defined), Venus shall be entitled to
> receive a reversionary working interest in and to the Leases located within the
> AMI (as hereafter defined), to the extent and on the basis assigned to Samson
> herein, equal to a proportionally reduced sixteen and two-thirds percent
> (16.66667%) in the Leases.

See Venus-Samson PSA at 3.  Paragraph 8, subparagraph (i) defines "AMI" as an "Area of

Mutual Interest,"

> *which shall cover and affect all oil, gas and other hydrocarbon interests in all of*
> *the lands included within the geographic boundaries of the area outlined in black*
> *on Exhibit "C" attached hereto.*

Id.  Exhibit C is a plat of various Nome Prospect properties.  Some are enclosed by a black line that PYR describes as "a crude felt-tip line."

Samson conveyed to PYR a working interest on April 1, 2005.[19]  To effect the conveyance, Samson executed a document titled "Partial Assignment and Bill of Sale" conveying to PYR the agreed percentage of Samson's interest in oil and gas leases and term mineral deeds described in an "Exhibit A" which listed 44 properties.  The assignment was limited, however, in that it stated expressly that the assignment was operative:

> *INSOFAR AND ONLY INSOFAR as the Leases are located within*
> *the boundaries outlined on the plat attached hereto and made a part*
> *hereof as Exhibit B.*

App. to Pl.'s Mot. for Partial Summ. J. at Tab No. 16, p.1.  The plat attached as Exhibit B is an exact copy of the Exhibit C attached to the Venus-Samson PSA, which contains the "crude felt-tip line" designating the Area of Mutual Interest mentioned and defined in paragraphs 7 and 8 of the PSA.

The basis and particulars of PYR's assertion that Samson failed to make a complete assignment of the working interest is unclear.  PYR contends either that (a) the PSA required Samson to assign a working interest in each entire lease within the AMI even if a portion thereof lay outside the black line, or (b) the PSA required Samson to assign also a working

---

[19]   According to PYR, April 1, 2005, was over five months after project payout.

interest in leases not shown on the plat or that lay entirely outside the black line.[20]  In either case, PYR contends that Samson breached the PSA by excluding from its working interest assignment lease acreage outside the black line boundaries outlined on the plat.

Samson's interpretation of its duty to convey a working interest upon project payout is a logical and reasonable interpretation of plain and clear contract language.  PYR's interpretation, on the other hand is indistinct and foggy.  Under the present state of the record and briefing, the court cannot conclude as a matter of law that PYR is entitled to summary judgment on this claim.  PYR's relief, if any, will be considered better at trial in connection with its alternative claim for reformation based on mutual mistake and scrivener's error, and in connection with Samson's counterclaim for overpayment.

## VIII.  ALLEGED BREACH BY FAILURE TO PROVIDE INFORMATION

PYR asserts that Samson breached Article VI., Section D., of the 2003 JOA by failing to provide certain information or access to information pertaining to the development or operation of the properties.[21]  PYR submits the affidavit of Kenneth Berry, Jr., PYR's Vice

---

[20]     The court assumes that PYR asserts that Samson was required to convey a working interest in leases entirely outside the black line since PYR emphasized the clause in Paragraph 7(i) of the PSA stating that Venus (now PYR) was entitled to a working interest in leases "to the extent and on the basis assigned to Samson herein."

[21]     Article VI., Section D., of the 2003 JOA provides that:

Each participating party shall have access to the Contract area . . . and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books and records relating thereto.

See Defs.' Resp. to Pl.'s Mot. for Partial Summ. J. at 26.

President – Land, along with numerous copies of letters and emails sent from PYR to Samson which suggests that Samson refused to provide *any* information.

In response, Samson asserts that it has provided *or made available* to PYR all *required information* under the 2003 JOA.  Samson supports its assertion with an affidavit of Richard G. Koenig, a Samson landman, who states Samson maintains and transmits records and information in the regular course of business, and that Samson has provided or made available to PYR all information required by Article VI., Section D.  However, the affidavit does not state how the records are available nor what documents are available to PYR under Article V., Section D., of the JOA.

The merits of PYR's claim that Samson failed to provide information turn on fact-based issues.  First, it appears that the parties may be galvanized into a semantic dispute over whether Samson satisfies its obligation regarding information by making it *available* or only by physically *providing* it.  Second, there are disputed issues as to *scope* of information required to be produced.  Third, there are disputed issues as to whether any information whatsoever has been produced, and if so, what information was produced.

Summary judgment is not appropriate until after adequate time for discovery.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Although this case is beginning to sprout whiskers in terms of its tenure on the docket, discovery remains in its infancy as evidenced by the fact that five motions relating to unresolved discovery disputes are pending.  For this reason and others articulated in this section, this issue is not a candidate for summary disposition at this point.

## IX. BREACH OF FIDUCIARY DUTY

Conclusions reached in Section V. make it unnecessary to consider PYR's alternate claim that Samson breached a fiduciary duty by pooling the Sun Mineral Fee into a unit that contained unproductive acreage.  PYR's royalty is not subject to pooling by Samson, and Samson must pay the royalty based on PYR's full interest in the well production.  This moots the alternative claim as to the royalty.  Conversely, the Sidetrack Unit was formed at a time when Samson was the sole owner of the interest from which the reversionary working interest was carved later.  Samson owed no fiduciary duty on which PYR can base a tort claim regarding pooling of the working interest.[22]  Therefore, the court will dismiss this alternative cause of action *sua sponte*.

———————————

An order (a) partially granting and partially denying each party's motion for summary judgment and (b) dismissing PYR's breach-of-fiduciary-duty alternative cause of action will be entered separately.

SIGNED this ___15___ day of September, 2006.

*Earl S. Hines*
_____
Earl S. Hines
United States Magistrate Judge

———————————

[22]    The court expresses no opinion on whether PYR might assert a contract claim arising from the same alleged conduct.  Such a claim would turn on whether Samson's contractual duty to perform as a reasonably prudent operator under PSA Paragraph 9 and Article V.,A. of the attached JOA includes a duty either to exclude unproductive acreage from a unit or to account to nonoperators only on the basis of productive acreage when a unit includes unproductive acreage.