IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

BEAUMONT DIVISION

| | | |
|---|---|---|
| PYR ENERGY CORPORATION | § | |
| | § | |
| V. | § | 1:05-CV-530 |
| | § | |
| SAMSON RESOURCES COMPANY | § | |
| and SAMSON LONE STAR | § | |
| LIMITED PARTNERSHIP | § | |

## MEMORANDUM OPINION ON MOTIONS FOR CLARIFICATION, RECONSIDERATION AND REHEARING

On September 15, 2006, the court issued its ruling, accompanied by a memorandum opinion, on the parties' competing motions for summary judgment.[1]  The court partially granted and partially denied each motion, while reserving other issues for trial.  Both parties subsequently moved the court to reconsider, rehear, or clarify aspects of the court's ruling, especially points decided adversely to that party.  This opinion addresses these motions to the extent they warrant further commentary or analysis.

---

[1]    PYR Energy Corp. V. Samson Res. Co., 456 F.Supp.2d 786 (E.D. Tex. 2006).

# I. INTRODUCTION

One hundred and six years ago today, within the territorial jurisdiction of this district and less than ten miles south of the present courthouse, the ground beneath a small wooden derrick housing an ongoing drilling operation of a single wildcat well began to shudder.  Around 10:30 A.M.,

> ". . .with an ear-shattering roar, the earth began to spew uncounted tons of mud, gas, rocks, and finally a towering column of heavy green crude oil, six inches around, erupting almost two hundred feet in the air.
>
> The roaring geyser of oil hurled pipe skyward and scattered it over the prairie like straws.  It blasted aawy the crown block of the homemade derrick, knocked off the superstructure, and sent the terrified crew scrambling for safety before it blazoned the Southeast Texas sky with a soaring banner of oil.  With the advent of this well – the Lucas Gusher, named for Captain Anthony F. Lucas, the Austrian mining engineer who brought it in – the Spindletop oil field was born."  [2]

Upon the centennial anniversary of that chaotic event, local historians observed that with the birth of Spindletop, *"the course of history veered sharply in a new direction."*[3]  Michel T. Halbouty commented that Spindletop was *"a famous discovery which revolutionized industrialization and the standard of living worldwide."*[4]  To verify these

---

[2]      Judith Walker Linsley et al., <u>Giant Under the Hill, A History of the Spindletop oil Discovery at Beaumont, Texas, in 1901</u> at 1 (Texas State Historical Ass'n 2002) (hereinafter <u>Giant Under the Hill</u>).

[3]      <u>Id.</u>

[4]      Michel T. Halbouty, *Preface* to <u>Giant Under the Hill</u> at xi.

emphatic assertions, one need ponder only the fact that Spindletop spawned industry giants later known as Gulf, Texaco, Sun, Humble (Exxon) and Magnolia (later part of Mobil) who recast the infant oil and gas industry and rose to global dominance.

The Spindletop field itself peaked within two years and then steadily declined. But it generated an oil exploration boom unlike any before.  By 1917, there were twenty-six refineries operating in Texas, and by the eve of World War II, there were forty-six oil fields within a hundred-mile radius of Spindletop, with 2440 producing wells.[5]

Needless to say, an abundance of legal disputes inevitably accompanied this much commercial activity.  Texas jurists, legislators, and regulators were required to steadily and vigorously develop the state's standards governing the rights of those who own and produce such vital commodities as oil and natural gas.  Texas now is richly endowed with a body of natural resources law fashioned by more than a century of experience.

Unfortunately, that endowment does not fully sustain the present lawsuit which centers on one of Spindletop's offshoot fields known as the Nome Prospect, located not far away from Spindletop in Jefferson County, Texas.  One of the industry giants mentioned earlier, Sun Oil Company (Sun), plays a cameo role.  Sun

---

[5]        Giant Under the Hill at 212.

owned a particular 122.57 acre tract, referred to by the litigants as "Tract 3" of the "Sun Mineral Fee tract." The story of Tract 3, while not as epical as Spindletop, is nevertheless a remarkable saga, at least in the eyes of a lay judge.

In 1993, Sun entered into a farmout agreement and Joint Operating Agreement (JOA) with Anadarko. The following year it executed a term mineral deed in which it conveyed a 60% interest in the Sun Mineral Fee tract and other tracts to Anadarko. Almost a full century after the Lucas Gusher blew in, and after every square inch of Jefferson County, Texas, presumptively had been probed, poked and over-produced to apparent full depletion, a new, successful gas well was drilled in 1994 on one of the Sun mineral fee tracts subject to the Anadarko farmout. Thereupon, a pooled unit (the Sun Fee No. 1 Gas Unit) was formed. There followed a complex series of assignments, partial assignments, and letter agreements, often accompanied by joint operating agreements, through which the current litigants acquired interests in those mineral fee and lease properties.

By 2004, the 1994 Sun well ceased commercial production. But then, in an even more striking development (again to the uninitiated), the present defendants, Samson Resources Company and Samson Lone Star Limited Partnership (Samson), re-entered the very same well bore of the 1994 well, and drilled yet another successful gas well! It was a directional well known as the Sidetrack Well, and it bottomed on

the 122.57 acre Sun Mineral Fee tract.  Samson then pooled that tract into a new,
704-acre pooled unit (the Sun Fee No. 1 Sidetrack Gas Unit).

The plaintiff in this action, PYR Energy Corporation (PYR), owns mineral fee
interests and oil and gas leases in the subject properties.  PYR asserts numerous causes
of action against Samson, primarily centering on PYR's contention that Samson
pooled PYR's interests without authority and thereby breached a governing agree-
ment between Samson and PYR's predecessor by failing to pay overriding royalties
and income attributable to its working interests based on PYR's full interest in the
well production.  PYR asserts various other counts of breach of contract, together
with related tort and reformation claims more fully described in the court's earlier
opinion regarding the parties' cross motions for summary judgment.

Finally, and perhaps even more astonishing than the nine-lives persona of the
Nome Prospect, is the fact that after a full century of subject-matter jurisprudence,
statutes and regulations, this lawsuit over a single producing gas well raises at least
three novel or unsettled questions of Texas law.  Those are:

1.     Should Texas imply pooling authority in transactions between oil
       companies or knowledgeable persons active in the industry when surround-
       ing circumstances, including documents executed by the parties, reflect that
       all parties assumed pooling would take place?

2.     Does the Texas constructional preference for a covenant rather than a
       condition apply even though construing the interest in question as a
       reversionary working interest rather than a mere contractual right would

work only a partial forfeiture rather than a total forfeiture of the other party's interest?

3.      Is an operator bound to reform a pooled gas unit to exclude unproductive acreage (or to account to other interest owners solely on the basis of productive acreage) if the inclusion of such acreage adversely affects the rights of a party whose interest vested only after the pooled unit was formed?  If there is such a requirement, does it arise only upon a showing of gross negligence or willful misconduct by the operator when forming the unit?

The parties' cross motions for summary judgment did not pose or argue the above issues as precisely or as clearly as they do now.  Nevertheless, those issues and many others were implicit in their original submissions, and the court addressed them in varying degrees.  Essentially, the court answered the first question in the negative, the second in the affirmative, and found it unnecessary to address the issues raised by the third question.

For reasons stated below, the court now adheres to its original analysis. However, each issue is close, and could be decided differently without doing violence to reason, interests of justice, or Texas policy generally favoring pooling.  Thus, no matter how this trial court resolves these unquestionably non-federal issues, an adversely-affected party will have good faith grounds for appeal.  Moreover, unless the governing court of appeals perceives the relevant analytical factors more clearly, and can decide these puzzling issues of Texas law more confidently than did the under-

signed, even when ably assisted by an eminent subject-matter expert,[6] it is foreseeable that the appellate court will defer initially and utilize its ability to certify the above questions to the Texas Supreme Court for definitive answers.[7]

If this forecast is accurate, the judicial process inevitably will involve additional time and considerable expense to the parties.  An unfortunate consequence could be that the new Sidetrack Well could cease commercial production before the courts sort out the knotty questions presented here.  Thus, this case represents another opportunity for grim reaffirmance of the adage that justice delayed often is justice denied.

In most instances, the specter of additional expense, protracted proceedings and uncertain outcomes propels litigants, especially sophisticated businesses more interested in achieving optimum economic results than in developing arcane points of state law, to negotiate a resolution of their differences through alternative means.  To date, however, the parties here prefer a judicial resolution.  So, the wheels of justice shall grind, unavoidably slow but exceedingly fine.  Future law professors, legal

---

[6]      The court's appointed subject-matter expert was Professor Ernest E. Smith, co-author of the leading treatise titled <u>Texas Law of Oil and Gas</u>.  See footnote 4 of the court's original memorandum opinion on motions for summary judgment.

[7]      Federal courts may certify questions to the highest state court when resolution of the issue in a federal case involves state law questions. <u>See</u> 17A Charles Alan Wright & Arthur R. Miller, <u>Federal Practice & Procedure</u> § 4248 (2d ed. 1988); <u>Lehman Bros. v. Schein</u>, 416 U.S. 386 (1974). The Texas Supreme Court is authorized to answer certified questions of state law if the certifying court is presented with determinative questions of Texas law having no controlling Texas Supreme Court precedent.  <u>See</u> Tex. R. App. P. 58.1.  The Texas Supreme Court is authorized to accept certified questions from federal appellate courts only.  <u>See</u> <u>id.</u>

commentators, and seminar speakers, at least, and perhaps some courts will benefit if the parties stay their course.

## II. ORIGINAL RULINGS

The court's original opinion recites underlying facts, asserted claims and defenses, and arguments advanced in support of each party's motion for summary judgment.  There is no compelling need to reiterate those matters here.  However, it is appropriate to restate the court's earlier rulings with brief explanatory comment.

First, the court sided with PYR on the issue of whether Samson had authority to pool PYR's overriding royalty interest.  The court embraced PYR's argument that Jones v. Killingsworth, 403 S.W.2d 325 (Tex. 1965), and a long line of repeated judicial rulings hold that a lessee has no power to pool royalty interests without express consent of their owners.  The court then examined a June 12, 2003, Purchase and Sale Agreement (PSA) and an attached Joint Operating Agreement (JOA) and concluded that neither provided the necessary express authorization.  Further, the court determined that circumstances do not warrant application of a judicially-recognized exception which holds that an interest reserved or conveyed out of an interest created by an owner who expressly authorized a lessee or other operator to pool his interest is presumptively subject to pooling.  Finally, the court declined Samson's invitation to recognize a new presumptive-authority-to-pool exception

based on identity of the contracting parties, industry custom, and surrounding
circumstances.

Second, the court sided with Samson on the issue of whether it had authority
to pool PYR's "reversionary working interest."  The parties argued over whether the
PSA created a presently vested future interest or a covenant or contractual right to an
assignment upon occurrence of a future event.  The court determined that the
meaning of that term as used in the PSA was uncertain, and therefore applied a
generally-accepted constructional preference for a covenant rather than a condition.
It followed, therefore, that when Samson formed the Sun Fee No. 1 Sidetrack Gas
Unit, it owned all interests other than PYR's overriding royalty.  Samson clearly was
entitled to pool its own interests, and under <u>Union Pacific Resources Co. v.</u>
<u>Hutchison</u>, 990 S.W.2d 368, (Tex. App. – Austin 1999, pet. denied), PYR received
its working interest subject to prior pooling of land of which it was once a part.

Third, the court rejected or deferred until trial other arguments related to the
pooling question advanced by Samson.  The court concluded that PYR has standing
because PYR owned its interests in June, 2004, when its right to share in the produc-
tion arose upon the Sidetrack Well's first production, and when PYR was first injured
as its interests in production were diluted because of Samson's pooling.  The court
declined to rule on Samson's argument that PYR ratified the unit and was prohibited

by waiver and estoppel from now challenging the formation or configuration of the unit.  Samson's ratification/waiver/estoppel contentions are asserted as an affirmative defense, and Samson did not formally move for summary judgment on its affirmative defenses.  Moreover, the court perceived genuine issues of material fact that would preclude summary judgment for either party on these defenses.

Fourth, the court deferred until trial PYR's claim that Samson failed to make a complete assignment of a working interest upon project payout.  Samson executed an assignment of a working interest in 44 properties as defined by an attached plat.  The precise contours of PYR's objections to the assignment were unclear to the court, and under the state of the briefing, the court concluded that PYR's claim would be better considered at trial along with PYR's alternative claim for contract reformation and Samson's counterclaim for overpayment.

Fifth, the court also deferred until trial PYR's breach of contract claim asserting that Samson failed to comply with its duty under a 2003 Joint Operating Agreement to provide certain information or access to information pertaining to the development or operation of the properties.  The court concluded that the merits of such claim are fact-based, and that genuine issues of material fact exist as to what information Samson provided and whether it was fully compliant with its contractual obligation.

Next, the court determined that it would dismiss *sua sponte* PYR's alternative tort claim that Samson breached a fiduciary duty by pooling the Sun Mineral Fee into a unit containing allegedly unproductive acreage.  Under the court's pooling analysis, PYR's royalty is not subject to pooling by Samson, and Samson must pay the royalty based on PYR's full interest in the well production.  That moots PYR's alternative tort claim as to the *royalty*.  The Sidetrack Unit was formed when Samson was the sole owner of the interest from which the reversionary working interest was carved later.  Thus, Samson owed no fiduciary duty on which PYR can base a tort claim regarding pooling of the *reversionary working interest*.

Finally, and somewhat as an aside to the breach-of-fiduciary-duty analysis, the court stated in a concluding footnote 22 the following:

> The court expresses no opinion on whether PYR might assert a contract claim arising from the same alleged conduct.  Such a claim would turn on whether Samson's contractual duty to perform as a reasonably prudent operator under PSA Paragraph 9 and Article V.,A. of the attached JOA includes a duty either to exclude unproductive acreage from a unit or to account to nonoperators only on the basis of productive acreage when a unit includes unproductive acreage.

## III.  DISCUSSION OF MOTIONS TO RECONSIDER, REHEAR, AND CLARIFY

Both parties filed motions requesting a rehearing, clarification, or reconsideration of various portions of the Court's opinion.  The brief in support of Samson's Motion includes a reply to PYR's Motion, and PYR has filed a response to Samson's

reply.  Rather than discuss the briefs in the order in which they were filed, the court

will discuss the issues presented by the briefs primarily in the order in which those

issues appeared in the court's original opinion.

**A.      Samson's Lack of Authority to Pool PYR's Overriding Royalty**

The bulk of Samson's brief is an argument against the Court's conclusion in

section V of the original opinion that Samson lacked authority to pool PYR's

overriding royalty interest (ORRI).  Samson's arguments in favor of pooling authority

are largely restatements of the arguments made in its earlier briefs.  The pervasive

theme is that the identity of the parties and the language of the various instruments

indicating an assumption that pooling would take place point to a clear intent to

grant pooling authority.  Additionally, Samson points to four specific potential

sources of express pooling authority over the ORRI.

**1.      Paragraph 6(ii) of the PSA**

Samson's principal argument is directed at section V.A.1 of the Opinion, where

the Court concludes that paragraph 6(ii) of the PSA does not grant it authority to

pool the ORRI.  Paragraph 6(ii) states that "*[i]f the Leases or any part thereof are pooled .*

*. . then the Venus ORRI shall be reduced in the proportion that the acreage burdened by said*

*Venus ORRI bears to all of the acreage included in any such pooled unit.*"  Samson points

out that under this language the ORRI is automatically reduced without Venus'

consent if the leases or mineral fees are pooled.  It then argues that all it needs to

form a pooled unit that includes the ORRI is authority under the Leases or the right

as owner of the Mineral Fee to pool.  Since it has that authority under the Leases

and, as owner of the Mineral Fee, has the right to pool, and since it has exercised this

right by forming a pooled unit, the ORRI is automatically proportionately reduced,

i.e., has automatically become subject to pooling.

This argument is set out more clearly than in earlier briefs, but it does not

address Samson's principal problem:  The language in Texas cases such as <u>Jones v.

Killingsworth</u>, 403 S.W.2d 325 (Tex.1965) and the other cases cited in part IV.A. of

the original opinion that a lessee must have express authority to pool a royalty,

regardless of whether it is a lessor's royalty, a nonparticipating royalty interest, or an

overriding royalty.  Oil and gas leases that grant pooling authority use completely

unambiguous language.  The "Texas form" promulgated by the American Association

of Petroleum Landmen states in paragraph 4 that "*Lessee, at its option, is hereby given the

right and power to voluntarily pool etc*."  The 1976 lease form put out by the old Pound

printing company uses identical language.  But here, Paragraph 6(ii) merely states

what happens to the ORRI *if* there is pooling; it does not expressly grant authority to

pool.

2.    <u>Paragraph 6(iii) of the PSA</u>

Samson's claimed second source of pooling authority is paragraph 6(iii) of the PSA.  This section provides that the ORRI "*shall be treated in the same manner as the Lessor's royalty under any of the Leases to which ORRI attaches or is burdened by . . . .* "  As the original opinion points out, the ORRI does not burden any of the leases that contain pooling clauses.  Samson does not dispute this, but instead makes an argument based on the use of the disjunctive "or."  It argues that, properly construed, this provision means that the ORRI "attaches" to the leases even though it does not "burden" them.  As the court best understands this argument, it is:  The "attaches" language was included because when the PSA was drafted, the parties did not know which leases would be burdened by the ORRI, and wished to make sure that the ORRI could be pooled.  Since the leases were "attached" to the PSA, the ORRI is attached to the leases.

This construction is neither logical nor consistent with the actual language used.  If the parties had intended this construction, why would they not have simply agreed that the ORRI "shall be treated in the same manner as the Lessor's royalty under the oil and gas Leases attached to the PSA"?

3.     Article VI of the 2003 Joint Operating Agreement

Samson's claimed third source of express pooling authority is Art. VI of the

2003 JOA, which was attached to the PSA.  This article provides that the *"configura-*

*tion . . and land included in a Lease Unit shall be designated by the Operator."*  Samson

concedes that the Court may be correct in concluding that paragraph 8 of the PSA

makes the JOA operative only at "Project Payout" (which occurred only after it had

already formed the Sidetrack Unit) but contends that PYR is estopped by its plead-

ings to take this position.  Paragraph 24 of PYR's amended complaint, which Samson

quotes at page 8 of its pending motion, is merely a statement that Samson was the

operator of the Sun Fee Sidetrack Well at all relevant times. Paragraph 26 may come

closer to supporting an estoppel since it does state that all of Samson's actions are

covered by the operating agreement.

Estoppel is relevant, however, only if the original opinion is incorrect in

concluding that the relevant language of the JOA does not clearly authorize pooling.

Part of the court's reasoning, set out in section V.A.3 of that opinion, is based on the

full language of this provision, specially drafted for this particular JOA.  The sentence

immediately preceding the "configuration" sentence seems clearly to limit the entire

paragraph to the situation in which a party *"elects not to participate in the well contem-*

*plated herein . . . ."*  Samson correctly states that the well "contemplated" by the JOA

Page 15 of  39

was the Sun Sidetrack Well, but does not assert that any party "elected" not to participate in that well.  Rather it states that "Venus (and PYR) were not required to participate in that well."  The specially drafted provision applies, however, when a party "elects" not to participate.  The only party that could make such an election would be some other participant (Trail Mountain perhaps) that had a cost-bearing interest.

Because Venus, PYR's predecessor, had a non-cost bearing overriding royalty, it, along with other royalty owners including lessors, did not "elect" not to participate.  By the very nature of their interests, they were automatic non-participants.

### 4.   1996 Joint Operating Agreement

Samson's fourth claimed source of pooling authority is the 1996 JOA, which provides that unleased tracts are deemed subject to an attached oil and gas lease.  The attached lease contains a standard pooling clause.  Samson asserts that as a result of Sun Oil Company's assignment of the Sun Mineral Fee, the 1996 JOA is binding on all parties.  At page 10 of its brief, Samson states that "*when Sun – not a party here – assigned the fee mineral tracts, it expressly stipulated that the 1996 JOA would be in effect, and all parties, including PYR, took their assignments subject to that requirement. . . . The 1996 JOA . . . still provides covenants that Sun stipulated would 'run with the land' and bind all subsequent assignees*."

Samson does not provide a record reference to Sun's assignments, so the court assumes that Samson is referring to the two deeds in which Sun conveyed all its interest in the Sun Mineral Fee tracts to Anadarko except for a royalty that Sun retained in the original well.  There is no reference to a stipulation that the 1996 JOA is in effect, a statement that the JOA binds all subsequent parties, or any mention of a covenant running with the land in either of Sun's deeds to Anadarko.  In its initial conveyance, dated April 29, 1994, Sun conveyed 60% of its interest to Anadarko by a deed providing, among other matters, that the grant would last for so long as "the Letter Agreement and Joint Operating Agreement attached thereto are in effect" or as long as oil or gas were produced.  This reference clearly is to the 1993 JOA, rather than the 1996 JOA.  Samson may be confusing the 1996 JOA with the 1993 JOA, because both contain "deemed lease" provisions and have as an attachment a lease that provides for pooling.  However there is nothing in this initial deed that indicates any intent that the JOA be binding on all successors in interest or that the JOA's provisions are covenants running with the land.

Sun subsequently conveyed its remaining 40% interest in the Sun Mineral Fee tracts and reserved a royalty in itself by a deed dated August 28, 1996.  That deed provided that it was made "subject to the terms of that certain Letter Agreement dated August 23, 1996 between Grantor and Grantee."  The court has not located

this Letter Agreement in any of the appendices to the various briefs, but will assume

that the 1996 JOA was attached to it; and that the Letter Agreement contains a

stipulation that the JOA is in effect, a statement that the JOA binds all subsequent

parties, and provides the JOA provisions constitute a covenant running with the land.

Even if all of these assumptions are correct, the Letter Agreement is not expressly

incorporated into the deed.  Indeed, the conveyance is also made "subject to" a long

boiler-plate list of "easements, exceptions, covenants, conditions, etc."  As Texas

courts have recognized, conveying land "subject to" listed interests is merely a means

of recognizing that there are outstanding interests that may effect the grantee's title.

E.g., Wright v. E.P. Operating Ltd. Partnership, 978 S.W.2d 684 (Tex. App. –

Eastland 1998, pet. denied).

A final possibility is that Samson is referring to some other instrument of

assignment that the court has been unable to locate.[8]  Even if that is the case,

however, and there is an assignment from Sun expressly stipulating that the 1996

JOA will continue to be in effect, that all future parties take their assignments subject

to the JOA, and that the provisions in the JOA "run with the land" and "bind all

subsequent assignees," Samson makes no attempt to show how the JOA provisions

would meet technical requirements for a covenant running with the land.  See, e.g.,

---

[8]      Since the two Sun-to-Anadarko deeds convey all of Sun's interest
except the retained royalty, the court has difficulty seeing how any additional
assignment of Sun's interest could exist, but is willing to give Samson the
benefit of the doubt.

<u>First Permian L.L.C. v. Graham</u>, No. 07-05-0135-CV, 2006 WL 1359652, at *3-4 (Tex. App. – Amarillo May 18, 2006, pet. denied) (discussing the prerequisites for a covenant running with the land).

      5.     <u>Conclusion</u>

None of Samson's restated arguments persuade the court that its original conclusions regarding PYR's ORRI are not fully supported by Texas law and the language of the documents at issue.  Consequently, the court will not change its decision on this point.  The court is confident that its analysis is faithful to precedent and the contracts' language, but is somewhat less confident that the Texas Supreme Court would feel it necessary to take as strictly literal an approach.  A Texas court might be swayed by Samson's arguments, and conclude that the assumption of pooling implicit in almost all of the instruments used in the various transactions amounted to tacit pooling authority and hold, as Samson urges this court to do, that nothing more is required when dealing with transactions between "sophisticated oil companies."

**B.     Nature of PYR's "Reversionary Working Interest"**

In Section V.D of the court's original opinion, the court construed PYR's reversionary working interest as a contractual right rather than a presently vested

future interest.  This construction compelled the court to find that when Samson

formed the Sun Fee No. 1 Sidetrack Gas Unit, it owned all interests other than PYR's

overriding royalty.  Samson clearly was entitled to pool its own interests.  Thus, when

PYR later received its working interest, that interest was subject to prior pooling of

land of which it was once a part.

PYR argues that the Court misconstrued its right to a working interest.  PYR

argues that rather than having a mere contractual right to receive a working interest

upon Project Payout, PYR's predecessor, Venus Exploration, Inc. (Venus), retained a

presently vested possibility of reverter or right of entry.

PYR's argument that the working interest should have been construed as a

presently vested possibility of reverter rather than a mere contractual right is far

better presented than in its initial briefs.  PYR offers three new points that warrant

discussion.[9]

1.   <u>Parallelism in PSA Sections creating ORRI and Reversionary Interest</u>

PYR argues that the language in the PSA providing for the ORRI – which was

clearly an immediately owned interest – and the equivalent language providing for a

---

[9]      In addition to the three points to be discussed in this section, PYR
offers other arguments including possible ambiguity of the PSA and the claimed
application of a fiduciary duty owed to it by Samson in forming a pooled unit.
These are largely repetitious of arguments made in earlier briefs, and are not
revisited here.

reversionary working interest are essentially identical.  Paragraph 6 provides that

"*Venus shall be entitled to an overriding royalty interest . . . ..*"  Paragraph 7 states that

"*Venus shall also be entitled to a reversionary working interest.*"  PYR suggests, therefore,

that the court lacks justification for treating the interests differently.

The court, however, discerns a difference.  First, language in paragraph 7(iii)

that "*upon Project Payout, Samson shall assign said reversionary interest . . .*" strongly

suggests that the interest is contractual.  Second, in <u>Rogers v. Ricane Enterprises</u>, 772

S.W.2d 76 (Tex. 1989) the Texas Supreme Court requires  "clear," "precise," and

"unequivocal" language before it will construe a provision as a condition rather than a

covenant.  The court states that "*[t]he language used by the parties will not be held to*

*impose a special limitation upon the grant of title unless it is **clear** and **precise** and **so***

***unequivocal that it can reasonably be given no other meaning.***"  <u>Id.</u>, at 79 (emphasis

added).  The language used in paragraph 7 of the PSA does not meet this test.

2.     <u>Reversionary Working Interest as a Vested "Carried Interest"</u>

Next, PYR urges the court to recognize that its "reversionary working interest"

is a "carried interest" that is common to the oil and gas industry, and generally

assumed to be a presently vested interest.  Under a "carrying" arrangement, one party

retains a fraction of the working interest, but the operator bears certain specified

costs up to an agreed-upon point, such as well completion, payout, etc.  At that point,

the carried party's interest becomes possessory, and the owner is entitled to partici-

pate in decision-making, receive income from the operation, propose additional

drilling, etc.

Specifically, PYR contends that the reversionary interest reserved to PYR's

predecessor, Venus, is a "*Manahan* type" carried interest of the type discussed in <u>R.R.</u>

<u>Comm'n of Texas v. Olin Corp.</u>, 690 S.W.2d 628, 629-30 (Tex. App.– Austin 1985,

writ ref'd n.r.e.) and in 2 Patrick H. Martin & Bruce M. Kramer, <u>Williams & Meyers</u>

<u>Oil and Gas Law</u> § 424.1 (2005) (hereinafter Williams & Meyers).  William &

Meyers describes the *Manahan* carried interest as follows:

> In the **Manahan** *type carried interest, the carried party has a future
> interest in a portion of the working interest which is so limited as to
> become possessory after the carrying party has recovered certain
> specified costs during the pay-out period.  Thus A, the owner of a
> lease or of some interest therein, may assign all or some part of the
> working interest to B, who undertakes the costs of specified drilling
> and development operations, A retaining a reversionary interest in
> part of the working interest, which reversion occurs when B has
> recovered the specified costs during the pay-out period.*

2 <u>Williams & Meyers</u> § 424.1 (2005).  The authors of this respected treatise then

observe that such an interest "*should be treated in much the same manner as an overriding*

*royalty and . . . classified as an interest in land.*"  <u>Id</u>.

Both <u>Olin</u> and William & Meyers assume that no action need be taken to

transfer the interest back to the original owner once payout occurs.  This is clearly the

case in <u>Olin</u>, where the carried interest is created under a standard JOA clause, and the reversion occurs automatically.  The same is true of the term royalty in <u>Bagby v. Bredthauer</u>, 627 S.W. 2d 190, 197 (Tex. App. – Austin 1981, no writ), which PYR has relied on heavily in all of its briefing on this issue.  In fact, the language used in the instrument in <u>Bagby</u> specifically disclaims the need of further action.  It states "*and upon termination of this reservation, the royalty hereby reserved shall become immediately vested in the Grantee, his heirs or assigns, without necessity of any further conveyance whatsoever*."  But the <u>Olin/Bagby</u> circumstances do not exist here.  As noted in the preceding section, paragraph 7(iii) of the PSA requires specific future acts upon project payout to vest the working interest.

PYR dismisses this significant difference by arguing that the PSA provision stating that "*upon Project Payout, Samson shall assign said reversionary interest . . .*" is not independent of the condition, but is simply a means of verifying that the future interest is now possessory.  In effect, it is just a "title-clearing" device – a ministerial or administrative act that Samson needed to do after PYR's carried interest automatically reverted.  This argument has some appeal, both from a title examiner's standpoint and a common sense standpoint.[10]  But the court must remember and heed the language of <u>Rogers v. Ricane Enterprises</u>, quoted earlier, and particularly the require-

---

[10]     If Venus or PYR wanted to sell its interest or borrow money against it, would not the other party to the transaction insist on seeing some instrument verifying Venus'/PYR's right to the working interest?

ment that instruments will not be held to impose a special limitation upon the grant of title unless the language therein is so unequivocal that it can reasonably be given no other meaning.  Reasonably, the language used in the PSA can mean what PYR says it means (a way of compelling Samson to clear up title after the working interest has automatically reverted to PYR), or it can mean that the PSA gave PYR only a contractual right to its working interest, and not a presently vested future interest that constituted a limitation on Samson's title.  In that circumstances <u>Rogers v. Ricane Enterprises</u> instructs: "Pick the second meaning."

The court's original opinion was faithful to that instruction.

3.     <u>Constructional Preference for Covenants Over Conditions</u>

The linchpin of the court's analysis regarding the nature of PYR's reversionary working interest – stated in the original opinion and again in the last two sections of this opinion – is that the meaning of that term as used in the PSA was uncertain, and that in such event, Texas courts express a strong preference for construing uncertain terms as covenants over conditions.  PYR now correctly points out that none of these cases involved *Manahan*-type carried interests, and all dealt with situations where treating the language as a condition would result in a complete rather than partial forfeiture of the other party's estate.  PYR suggests, therefore, that the policy disfavoring a condition is based on preventing a complete forfeiture of the other

party's entire estate.  PYR distinguishes this case because Samson would retain a sizeable estate even if the reversionary working interest were deemed a presently-vested future interest.  Samson would forfeit merely a relatively small part of the working interest.

Rogers v. Ricane Enterprises and the other cases that the court considered precedential did indeed involve potential total forfeitures of the lessee's working interest, and not a partial forfeiture, as would result here.  However, nothing suggests that the distinction between total or partial forfeiture was central to those decisions.  PYR has advanced no arguments as to why the policy disfavoring automatic forfeiture of a party's estate should be limited to total forfeiture.  Moreover, nothing in the courts' opinions suggests that when only a partial forfeiture might result, the courts would abandon their generally-recognized and well-established policy of looking upon conditions with disfavor when circumstances permit a covenant construction.  See 14 Am. Jur. Covenants § 3 at 481-82 (1938).  Finally, even if PYR is correct, there surely must be a point at which the size of the interest to be lost is relevant, but PYR offers no guidance as to where the line should be drawn in abandoning the construc-tional preference for a covenant.

4.    <u>Conclusions</u>

PYR's new brief makes a far better argument in support of its position regard-

ing the reversionary working interest than was in any of its earlier briefs.  Moreover,

Samson's reply does not address any of these new arguments, and says little more

than that the court correctly decided the issue in its original opinion.  This leaves the

debate in a "court versus PYR" posture.  Given that Samson's lawyers are more

experienced in the present subject matter than the generalist presiding judge, Sam-

son's silence is cause for pause.  It raises concern that Samson is unable or unwilling

to answer PYR's new arguments.

While the court is unpersuaded by PYR's new arguments, in candor the court's

original analysis and PYR's new opposing arguments run at almost a dead heat.  This

issue is as close to 50/50 as it could possibly be.  The court, however, cannot simply

leave the scales of justice evenly balanced as a law professor might do at the end of a

stimulating lecture on a perplexing issue.  The scales must tip, and the final tipping

point for the court is consistency.

Correlative language in <u>Jones v. Killingsworth</u> and other cases requires *pooling*

*authority* to be clearly and explicitly granted.  In spite of Samson's protestations that

"This case is different; we were knowledgeable oil companies contracting on the

assumption that common practices and custom apply," Samson's feet were held to the

fire:  "*Samson, if you wanted pooling authority, you should have said that in so many words.*"
Should not the same approach be taken with respect to language creating PYR's
reversionary working interest?  "*PYR, if your predecessor, Venus, intended to have a
presently vested reversionary working interest, it should have used unequivocal language in
creating such an interest, and not language that reasonably could be construed as creating merely
a contractual right*."

Consistency and balance generally are considered hallmarks of impartial
justice.  There is a nuanced view that "*a foolish consistency is the hobgoblin of little
minds*."[11]  Others must judge whether the court has fallen victim to a foolish consis-
tency.  But for the reasons expressed in this section, the court will adhere to its
original view.

## C.     Fiduciary Duty

The principal remaining issues addressed in the parties' various motions
involve section IX of the original opinion.  PYR argues that Samson owed it a
fiduciary duty when it formed a pooled unit that would ultimately include its
reversionary working interest, and that Samson breached that duty by forming a unit
that included allegedly nonproductive acreage.  PYR advances three interrelated
sources for a fiduciary duty.

---

[11]     Ralph Waldo Emerson, *Self Reliance, in* <u>Essays: First Series</u> (1841).

1.    <u>Executive Duty Doctrine</u>

The first potential source is the duty owed by the holder of an executive right to owners of non-executive interests.  The leading case imposing such a duty is <u>Manges v. Guerra</u>, 673 S.W.2d 180 (Tex. 1984).  PYR fails to recognize, however, that applying the <u>Manges</u> doctrine to the facts of this case would be an extension of the executive-duty doctrine to a situation where it has never previously been applied by Texas courts.  Texas courts equate the term "executive right" with the right to execute oil and gas leases.  <u>E.g.</u>, <u>Altman v. Blake</u>, 712 S.W.2d 117 (Tex. 1886); <u>French v. Chevron U.S.A., Inc.</u>, 896 S.W.2d 795 (Tex. 1995).  The issue of the duty of the holder of such a right arises when the "executive" executes a lease that affects some other person's interest as well the executive's.  Such a situation is fairly common.  For example, a person may acquire land subject to a nonparticipating royalty interest (NPRI) that entitles its owner to $1/4^{th}$ of any royalty reserved in any oil and gas lease on the land.  The new landowner leases the land to himself or a close family member for a $1/8^{th}$ royalty, and then assigns the lease to an oil company, reserving a $1/16^{th}$ overriding royalty.  See, e.g., <u>Manges</u>; <u>Mims v. Beall</u>, 810 S.W.2d 876 (Tex. App. – Texarkana 1991, no writ).

Courts have stated repeatedly that in such situations the executive must protect the non-executive's interest, and may not obtain for himself benefits attribut-

able to the mineral estate that are not shared proportionately with the non-executive. But in these cases, the plaintiffs (non-executives) owned a mineral interest, such as an NPRI or some other interest that would be affected in some way by the executive's right to execute oil and gas leases.  None of the cases alleging breach of the executive's duty involved pooling.

Claimed misconduct in pooling has been dealt with by determining if the lessee had express authority to pool in the manner at issue and, if so, whether the lessee exercised that authority in good faith.  See Ernest E. Smith & Jacqueline L. Weaver, Texas Law of Oil and Gas § 4.8(B) (1998 ed. and 2006 Updates).  Even if the executive-duty cases might reasonably be deemed to extend to pooling, which also involves actions by a party that may adversely affect the interest of a party who has no legal right to participate in the questioned action, PYR still lacks what the plaintiffs in the executive-duty cases all had:  a present ownership interest in a royalty or non-executive mineral fee interest that was affected by the action.  If the analyses of PYR's reversionary working interest in section V.D of the original opinion and in section III.D of this opinion are correct, PYR had only a contractual right to receive a working interest at an uncertain date in the future – when and if the project paid out.[12]  No fiduciary duty existed, therefore, when Samson formed the unit.

------

[12]    If, as PYR continues to claim, it had a presently vested future interest in the nature of a possibility of reverter or right of entry, such an
(continued...)

2.      Duty of Good Faith in Pooling

A second potential source of the claimed fiduciary duty is the "good faith" requirement imposed upon lessees in forming pooled units.  E.g., Circle Dot Ranch, Inc. v. Sidwell Oil & Gas, Inc., 891 S.W.2d 342 (Tex. App. – Amarillo 1994, writ denied).  The problem with this argument, as with the executive-duty argument, is that at the time Samson formed the pooled unit, PYR did not own any interest that was subject to pooling.  PYR had only a contractual right to receive a working interest at an uncertain date in the future.  To the extent that PYR impliedly argues that Samson must exercise all of its contractual rights in good faith, it fails to address the argument advanced by Samson in earlier briefs that Texas does not imply a good faith requirement in ordinary contracts.

3.      Duty of a Reasonable Prudent Operator

Thirdly, PYR points to the JOA attached to the PSA as a source of the fiduciary duty owed to it.  After project payout, when PYR received its working interest, the parties rights and obligations became governed by the JOA, as provided in paragraph 8 of the PSA.  If Samson owed PYR a duty to reform the Sun Fee No. 1

---

[12](...continued)
interest was not subject to pooling without express authority.  See Wagner & Brown, Ltd. V. Sheppard, 198 S.W.3d 369, 377 (Tex. App. – Texarkana 2006, pet. filed), holding that a pooling declaration did not bind the lessor's possibility of reverter.

Sidetrack Gas Unit to include only productive acreage, or an equivalent duty to account to PYR solely on the basis of productive acreage, that duty was not as a fiduciary, but as a reasonable prudent operator.  Thus, PYR mixes apples, oranges, and bananas when it argues that a fiduciary duty arose from the JOA.

For these reasons, PYR has not presented convincing arguments for modifying the "Fiduciary Duty" portion of the original opinion.

**D.**     **Contractual Duty to Reform a Unit**

When confronted with PYR's alternative claim that the JOA attached to the PSA imposes a source of a contractual duty (as opposed to fiduciary duty) to form a unit containing only productive acreage, Samson counters that if the JOA did not become effective and binding on the parties to the PSA until project payout, as the original opinion holds, the JOA could not have imposed any duty upon it when it formed the pooled unit.  Alternatively, Samson argues that *if* the JOA imposed duties upon Samson *after* it became effective – such as a duty to reform the unit to exclude unproductive acreage or to account to PYR only on the basis of productive acreage, such duties are governed by a gross negligence and willful misconduct standard. Samson argues, therefore, that it is entitled to summary judgment on this alternative claim because there is no evidence of such conduct in the record.

Samson's argument exposes the issue posed by the court in footnote 22 of the original opinion (quoted herein in section II, supra).  That footnote also spawned PYR's motion for clarification.  PYR correctly interprets the footnote as expressing no opinion on PYR's claim that Samson breached the underlying contracts by joining non-productive acreage into the Sun Fee No. 1 Sidetrack Gas Unit.  However, the court was remiss in not addressing that issue.  Samson's motion for summary judgment included a request for judgment on this issue, and PYR proffered its arguments in opposition.  Consequently, the court now considers the matter.

1.    <u>Contractual Relationship</u>

When payout occurred and Samson assigned a working interest to PYR, the relationship of the parties changed.  Under paragraph 9 of the PSA, their respective rights and obligations were then governed by the attached JOA.  Article V.A. of the JOA controlled with respect to Samson's obligations to PYR.  That article provides:

> *Operator . . . shall conduct **all operations** in a good and workman-like manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from **gross negligence** or **willful misconduct**.* (Emphasis added.)

Based on this provision, Samson argues that while it must act in "a good and workman-like manner," it can be held liable to PYR only upon a showing of gross negligence or willful misconduct.

2.      Circuit Precedent

Samson's argument is predicated upon Stine v. Marathon Oil Co., 976 F.2d

254 (5th Cir. 1992), wherein the Fifth Circuit held that the exculpatory language in

Article V.A. applied to *all* good faith actions undertaken by the operator under the

JOA, including performance of its contractual duties.  See id. at 261 (stating that the

protection of the exculpatory clause "clearly extends to breaches of the JOA").  Under

this interpretation, Samson can be held liable to PYR for forming and maintaining a

pooled unit containing nonproductive acreage only upon a showing that it was either

grossly negligent or engaged in willful misconduct.

3.      Intervening Texas Precedent

Although the Texas Supreme Court has not ruled on this issue, Stine may not

accurately forecast Texas law.  First, no Texas court has followed or even cited Stine's

substantive holding in the almost fifteen years since the Fifth Circuit made its "Erie

guess."  Second, subsequent holdings and statements by three separate Texas courts

of appeals suggest that Stine may no longer correctly state Texas law.  In Abraxas

Petroleum Corp. v. Hornburg, 20 S.W.3d 741 (Tex. App. – El Paso 2000, no pet.),

the El Paso Court of Appeals concluded that the requirement of gross negligence or

willful misconduct was limited to the operator's *physical activities* and did not apply to

performance of *contractual obligations* or *administrative actions*.  The same conclusion was

reached by the Eastland Court of Appeals in <u>Cone v. Fagadau Energy Corp.</u>, 68

S.W.3d 147 (Tex. App. – Eastland 2001, pet. denied), which rejected an argument

that gross negligence or willful misconduct was required in order to prevail on claims

based on breach of contract and accounting issues.  Finally, in <u>IP Petroleum Co., Inc.</u>

<u>v. Wevanco Energy, L.L.C.</u>, 116 S.W.3d 888 (Tex. App. – Houston [1st Dist] 2003,

pet. denied), the Houston Court of Appeals for the First District did require a finding

of gross negligence or willful misconduct in order to hold an operator liable for an

alleged failure to drill deeply enough to test a specific formation, but emphasized that

the non-operators' claim for damages involved *physical activity* by the operator, rather

than claims based on *breach of contract*.  Third, commentators and others suggest that

<u>Abraxas</u> is the better reading of Article V.A..  See 3 Ernest E. Smith and Jacqueline L.

Weaver, <u>Texas Law of Oil and Gas</u> § 17.3(B) (1998 ed. and 2006 Updates).[13]

   If these more recent authorities govern, then, as PYR argues, Samson, as

operator, was obligated to perform every activity "in a good and workmanlike

manner," and would incur liability for any breach of this standard except in the

---

[13]     The Tenth Circuit, while obviously not ruling on Texas law, recently
disagreed with the construction given Article V.A. in <u>Stine</u>.  Although applying
Wyoming law, the 10th Circuit Court of Appeals in <u>Shell Rocky Mountain Production
Co. v. Ultra Resources, Inc</u>., 415 F.3d 1158 (10th Cir. 2005), briefly discussed
<u>Stine</u>, disagreed with its holding that the gross negligence/willful misconduct
requirement applies to all actions taken by an operator, and held that a
nonoperator is not required to make a showing that the operator was grossly
negligent or acted willfully in incurring excessive drilling and operating costs.

situations, such as drilling and operating a well, where a plaintiff would be required to show gross negligence or wilful misconduct.  The "good and workmanlike" standard is synonymous with the reasonably prudent operator standard imposed upon a lessee. Johnson v. American Cometra, 837 S.W.2d 711, 716 (Tex. App. – Austin 1992, writ denied).

4.    Analysis

a.    Does Stine Govern?

The first issue which the court must resolve is whether Stine governs this court irrespective of what intermediate Texas appellate courts may have decided subsequently.  The answer to that question is found in F.D.I.C. v. Abraham, 137 F.3d 264 (5th Cir. 1998).  There, the court considered the circumstances when one panel of that court might depart from or overrule a prior decision of another panel of the court that made an "Erie guess" as to state law.  In F.D.I.C. v Abraham, the court held:

> . . . . [W]hen a panel is considering a governing question of state law on which a prior panel has ruled, the subsequent panel's obligation to follow that ruling is not alleviated by intervening decisions of intermediate state appellate courts unless such 'subsequent state court decisions . . .are **clearly contrary** to a previous decision of this court.'
> . . . . [W]hen our **ERIE** analysis of controlling state law is conducted for the purpose of deciding whether to follow or depart from prior precedent of this circuit, and neither a clearly contrary subsequent holding of the highest court of the state nor a subsequent statutory authority, squarely on point, is available for guidance, we should not disregard our own prior precedent on the basis of subsequent intermediate state court precedent **unless such precedent comprises unanimous or near-**

> *unanimous holdings from several - preferably a majority - of the intermedi-*
> *ate appellate courts of the state in question.*"

Id. at 268-69. [emphasis added]

This trial court surely is as bound to follow prior circuit precedent as are subsequent panels of the circuit court of appeals.  Here, there is no clearly contrary subsequent holding of the Texas Supreme Court; nor is there subsequent statutory authority, squarely on point, available for guidance.  Arguably, there are "unanimous or near-unanimous" intermediate appellate court holdings disagreeing with Stine, but they don't come close to a "majority" of Texas's 14 intermediate appellate districts. Therefore, even though Stine has never been followed, the preconditions for depart- ing from Stine are not shown to exist in this case.

> b.      *Would there be a Potential Breach of Contract in any Event?*

PYR contends that Samson breached its duty to perform the JOA in a good and workmanlike manner when it allegedly formed a unit in order to maintain leases and by forming a unit that it knew or should have known included non-productive acreage.  If those factual averments are accurate, there is some merit to PYR's argument.  Failure to consider geology in forming a pooled unit, pooling in order to maintain leases past their primary term, and the inclusion within a unit of non- productive acreage or acreage outside a well's drainage pattern are all factors that can

support a finding of bad faith pooling.  <u>Amoco Production Co. v. Underwood</u>, 558

S.W.2d 509 (Tex. Civ. App. – Eastland 1977, writ ref'd n.r.e.); <u>Elliott v. Davis</u>, 553

S.W.2d 223 (Tex. Civ. App. – Amarillo 1977, writ ref'd n.r.e.); <u>Circle Dot Ranch,</u>

<u>Inc. v. Sidwell Oil & Gas, Inc.</u>, 891 S.W.2d 342 (Tex App. – Amarillo 1994, writ

denied).  Logically, such factors could also support a finding of failure to act as a

reasonably prudent operator.

This does not settle the matter, however.  Since Samson owed no duty to PYR

at the time it formed the unit, the precise issue is whether the duty to perform as a

reasonable prudent operator includes a subsequent duty either to exclude unproduc-

tive acreage or to account to nonoperators only on the basis of productive acreage.

PYR has not cited any authority to support this proposition.  Moreover, imposing

such a duty may be stretching the language of both the JOA and paragraph 9 of the

PSA, which provides that "all subsequent *operations* . . . shall be conducted in accor-

dance with the terms" of the operating agreement.

For the time being, at least, this question must remain unresolved.

c.      *Samson's Motion is Premature*.

The uncertainty described in the preceding section would prevent the court

from comfortably or confidently granting Samson's motion for summary judgment on

this issue.  The better course is to defer this issue until trial when factual determinations may moot unsettled legal issues, or when further briefing might better illuminate them.  In any event, it would be premature for the court to act on the motion now.

Summary judgment is proper after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  A summary judgment motion may be denied if the nonmoving party has not had an opportunity to make full discovery.  <u>Id.</u> at 326.  Although this case has been pending for over seventeen months, discovery remains in its infancy, and several discovery disputes await resolution by the court.  Accordingly, Samson's motion for summary judgment on this claim will be denied without prejudice to reassertion when discovery is complete or at trial.

## IV.  SUMMARY AND CONCLUSION

By separate order, the court will implement this memorandum opinion by (a) clarifying that its earlier order did not adjudicate PYR's alternative contract claim that Samson breached underlying contracts by joining nonproductive acreage into the Sun Fee No. 1 Sidetrack Gas Unit; (b) denying Samson's motion for summary

judgment on that issue without prejudice to reassertion; and (c) otherwise denying

PYR's and Samson's motions to reconsider or rehear.

SIGNED this  10  day of January, 2007.

_____

Earl S. Hines
United States Magistrate Judge